**SCIENTISTS' INSTITUTE FOR PUBLIC INFORMATION, INC., Appellant,**

v.

**ATOMIC ENERGY COMMIS-SION et al.**

**No. 72–1331.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1972.

Decided June 12, 1973.

129. See note 5, *supra.*

J. G. Speth, with whom Ronald J. Wilson, Washington, D. C., was on the brief, for appellant.

Edmund B. Clark, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Kent Frizzell and Martin R. Hoffmann, Peter A. Bernard Gen. Counsel, Jerome Nelson, Sol., Atomic Energy Comm., and Thomas L. McKevitt and Peter R. Steenland, Attys., Dept. of Justice, were on the brief, for appellees.

John D. Hoffman, San Francisco, Cal., filed a brief on behalf of Sierra Club and Committee for Nuclear Responsibility, Inc. as amici curiae urging reversal.

Before BAZELON, Chief Judge, and WRIGHT and WILKEY, Circuit Judges.

**J. SKELLY WRIGHT, Circuit Judge.**

Appellant claims that the Atomic Energy Commission's Liquid Metal Fast Breeder Reactor program involves a "recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment * * . * " under Section 102(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(C) (1970), and that the Commission is therefore required to issue a "detailed statement" for the program. The District Court held that no statement was presently required since, in its view, the program was still in the research and development stage and no specific implementing action which would significantly affect the environment had yet been taken. Taking into account the magnitude of the ongoing federal investment in this program, the controversial environmental effects attendant upon future widespread deployment of breeder reactors should the program fulfill present expectations, the accelerated pace under which this program has moved beyond pure scientific research toward creation of a viable, competitive breeder reactor electrical energy industry, and the manner in which investment in this new technology is likely to restrict future alternatives, we hold that the Commission's program comes within both the letter and the spirit of Section 102(C) and that a detailed statement about the program, its environmental impact, and alternatives thereto is presently required. Since the Commission has not yet issued such a statement, we reverse and remand the case to the District Court for entry of appropriate declaratory relief.[1]

## I. FACTUAL BACKGROUND: THE LIQUID METAL FAST BREEDER REACTOR PROGRAM

Although more than a superficial understanding of the technology underlying this case is beyond the layman's ken, a brief summary will prove helpful. Nuclear reactors use nuclear fission—the splitting of the atom—to produce heat which may be used to generate electricity in nuclear power plants. Only a few, relatively rare, naturally occurring substances—primarily Uranium-235—can maintain the nuclear fission chain reaction necessary for operation of these

---

[1] The prayer for relief in this case did not seek an injunction against continuation of the program pending completion of an impact statement, and we accordingly intimate no views concerning such relief. The complaint seeks, in addition to declaratory relief, a judgment requiring the AEC, on the basis of the impact statement covering the overall program, "to adopt that course which most conforms to NEPA's policies." We question whether such relief is ever appropriate under NEPA. See Calvert Cliffs' Coordinating Committee v. USAEC, 146 U.S.App.D.C. 33, 36, 39, 449 F.2d 1109, 1112, 1115 (1971). In any event, such relief is inappropriate at the present time in this case since there is no indication that, aside from not preparing an impact statement, the AEC has given insufficient weight to environmental values in charting the LMFBR program's present course. See 146 U.S.App.D.C. at 39, 449 F.2d at 1115.

reactors. There are thus severe constraints on the long run potential of nuclear energy for generating electricity unless new nuclear fuel is "artificially" produced. Such fuel can be produced through the process of "breeding" within a "fast breeder reactor." The fast breeder reactor differs from the now common light water nuclear reactor in that the neutrons which split atoms in the fuel (thereby releasing new neutrons and heat energy) travel much faster than the neutrons in ordinary reactors. The reactor breeds new fuel through what has aptly been termed "a sort of modern alchemy." [2] Some neutrons leave the inner core of the reactor, which is made up of fissionable Uranium-235, and enter a blanket of nonfissionable Uranium-238. When atoms in this blanket are struck by neutrons, they are transmuted into Plutonium-239, itself a fissionable fuel which can be removed from the reactor and used in other installations. It is estimated that after about 10 years of operation the typical fast breeder reactor will produce enough fissionable Plutonium-239 not only to refuel itself completely, but also to fuel an additional reactor of comparable size. The Liquid Metal Fast Breeder Reactor (henceforth LMFBR) is simply a fast breeder reactor that uses a liquid metal, sodium, as a coolant and heat transfer agent.

Because the breeding principle makes possible vast expansion of fuel available for nuclear reactors (Uranium-238 is many times more common than Uranium-235), it has been the subject of considerable interest since the earliest days of atomic energy. The Commission demonstrated the feasibility of breeder reactors by constructing several experimental breeder reactors in the 1950's. In its 1962 Report to the President on Civilian Nuclear Power, the Commission specifically recommended that future Government programs include vigorous development and timely introduction of economic breeder reactors which, in the Commission's view, were essential to long-range major use of nuclear energy.[3] By 1967, when the Commission supplemented its Report to the President, the LMFBR had been singled out as a priority program representing the largest civilian power development area.[4] The Commission's focus expanded beyond solving the technical problems posed by the LMFBR, and began to embrace efforts to build an industrial base and obtain acceptance for LMFBR plant types by utilities, primarily through planned Government-assisted construction of commercial scale LMFBR electrical power plants.[5] In sum, the Commission came to see its program as serving "as the key to effecting the transition of the fast breeder program from the technology development stage to the point of large-scale commercial utilization." [6]

In furtherance of these objectives the Commission, in 1968, issued a 10-volume LMFBR Program Plan, the dual objectives of which were (1) to achieve, through research and development, the necessary technology, and (2) "to assure maximum development and use of a competitive, self-sustaining industrial LMFBR capability."[7] With growing concern about a possible energy crisis,

---

2. *See* Power Reactor Development Co. v. Int. U. of Elec., Radio & Machine Wkrs., 367 U.S. 396, 399, 81 S.Ct. 1529, 6 L.Ed. 2d 924 (1961).

3. United States Atomic Energy Commission (hereinafter AEC), Civilian Nuclear Power: A Report to the President 41 (1962).

4. AEC, Civilian Nuclear Power: The 1967 Supplement to the 1962 Report to the President 25 (1967).

5. *Id.* at 36.

6. AEC Authorizing Legislation, Fiscal Year 1972, Hearings on Civilian Nuclear Power Program before Joint Committee on Atomic Energy, 92nd Cong., 1st Sess., March 4, 1971, Part 2 (hereinafter cited as Authorization Hearings), at 699 (statement of Milton Shaw, Director, AEC Division of Reactor Development and Technology).

7. AEC, Division of Reactor Development and Technology, Liquid Metal Fast Breeder Reactor Program Plan, Vol. 1 (hereinafter AEC, LMFBR Program Plan), at

rapid commercial implementation of LMFBR technology has become a national mission.[8] In the style of President Kennedy's 1960 commitment to put an American on the moon by the end of the decade, President Nixon, in his June 4, 1971 Energy Message to Congress, announced as the highest priority item of his program "[a] commitment to complete the successful demonstration of the liquid metal fast breeder reactor by 1980," [9] and this goal has obtained the concurrence of Congress' Joint Committee on Atomic Energy.[10] Statutory authorization has been obtained to proceed with the first demonstration plant,[11] financed in large part by the federal government,[12] and the Commission has entered into negotiations with the Tennessee Valley Authority and Commonwealth Edison aimed at concluding construction contracts for the plant. On September 26, 1971 the President announced his intention to seek the necessary legislative authority for a second demonstration plant.[13] The Congress supports the program through annual appropriations and, at a time of general budgetary restraint, LMFBR program funds have recently mushroomed to $90.-3 million in fiscal 1971 and $130 million in fiscal 1972.[14] The Commission expects future federal expenditures for the program to be over $2 billion.[15] These funds have been in the past, and will continue in the future to be, matched with sizable financial commitments from the private sector.[16]

The LMFBR's prospects are sufficiently bright to have led President Nixon to say: "Our best hope today for meeting the Nation's growing demand for economical clean energy lies with the fast breeder reactor."[17] And the Commission has recently predicted that by the year 2000 LMFBR capacity will equal total electrical generating capacity in the United States today.[18]

1–3 (1968). *See also* H.R.Rep. No. 92–325, 92d Cong., 1st Sess., 25–26 (1971): "The purpose of this development program is not simply to show that we can build and operate a Liquid Metal Fast Breeder Reactor. When that has been accomplished, we must at the same time have established a viable, competitive LMFBR industry which is ready and capable of designing, constructing, and operating large (1000 MWe) LMFBRs."

8. *See* H.R.Rep. No. 91–1036, 91st Cong., 2d Sess., 21 (1970).

9. *See* 117 Cong.Rec. (Part 14) 18200 (1971).

10. *See* H.R.Rep. No. 92–325, *supra* note 7, at 25.

11. *See* Pub.Law No. 91–44, 83 Stat. 46 (July 11, 1969) (authorizing project definition phase of LMFBR program); Pub. Law No. 91–273, 84 Stat. 299 (June 2, 1970) (authorizing AEC to enter into cooperative arrangement for construction of LMFBR demonstration plant); Pub. Law No. 92–84, 85 Stat. 304 (Aug. 11, 1971) (increasing appropriations for demonstration plant program).

12. Pub.Law No. 91–273, *supra* note 11, authorized expenditure of $50 million in cash, $20 million in services, and $10 million in waiver of charges for use of nuclear material for the demonstration plant. Pub.Law No. 92–84, *supra* note 11, increased the cash commitment by an additional $50 million, bringing the total demonstration plant commitment to $130 million. *See* H.R.Rep. No. 92–325, *supra* note 7, at 24.

13. *See* 7 Weekly Compilation of Presidential Documents 1347 (Oct. 4, 1971).

14. These estimates were given by the Government in its answer to the complaint. *See also* H.R.Rep. No. 92–325, *supra* note 7, at 22.

15. *See* Authorization Hearings, *supra* note 6, at 695. *See also* AEC, Division of Reactor Development and Technology, Cost-Benefit Analysis of the U.S. Breeder Reactor Program (hereinafter AEC, Cost-Benefit Analysis) 18 (April 1969).

16. *See* Authorization Hearings, *supra* note 6, at 739 (past private sector expenditures); *id.* at 694 (projected future private commitments). For statements of representatives of several firms active in the breeder reactor industry concerning commitments of their firms to the LMFBR program, see AEC, Cost-Benefit Analysis, *supra* note 15, at App. B.

17. 117 Cong.Rec., *supra* note 9, at 18201.

18. *See* AEC, Office of Planning and Analysis, Forecasting Branch, Nuclear Power 1973–2000 at 5 (Dec. 1, 1972) (hereinafter AEC, Nuclear Power). *See also*

## II. APPLICATION OF NEPA TO TECHNOLOGY DEVELOPMENT PROGRAMS

NEPA requires federal agencies to include a detailed environmental impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment * * *." That the Commission must issue a detailed statement for each of the major test facilities and demonstration plants encompassed by the LMFBR program is conceded by the Commission and not at issue in this case. The Commission has already issued an impact statement for its Fast Flux Test Facility to be constructed in Hanford, Washington, and, at the President's request, has completed a statement for the first demonstration plant prior to the time such a statement would normally be issued.[19] Nor is the adequacy of either of these statements as they pertain to their respective individual facilities an issue on this appeal. The question raised, instead, is basically twofold: whether at some point in time the Commission must issue a statement for the research and development program as a whole, rather than simply for individual facilities, and, assuming an affirmative answer to this question, whether a statement covering the entire program should be drafted now.

Our consideration of this case has been somewhat complicated by the Commission's ambivalent position with respect to these already difficult questions. The Commission's basic position seems to be that NEPA requires detailed statements only for particular facilities, and that no separate NEPA analysis of an entire research and development program is required. In the words of then Chairman James Schlesinger: "These environmental statements are intended to deal with the particular facility or a particular project."[20] The Commission proposes two apparently inconsistent approaches to assess the overall environmental effects of and alternatives to its research and development program in light of the limitation it perceives in NEPA. First, it suggests that analysis of the broader aspects of the total program take place within statements on individual facilities.

"* * * Unlike the detailed statements * * * which are confined to an analysis of the individual subject facility, impact statements on the LMFBR plants will be cumulative in nature; that is, each statement will not only provide the requisite environmental analysis for each facility, but will also place that data within the context of the current state of knowledge for the program in order to provide an overall environmental assessment. * * *"[21]

AEC, Cost-Benefit Analysis, *supra* note 15, at 49, estimating construction of 49 LMFBR power plants in the 1980's, 453 in the 1990's, and 733 in the first decade of the 21st century.

Further evidence of the prospects for success of the LMFBR program lies in the major commitment of other nations in similar programs. *See generally* Authorization Hearings, *supra* note 6, at 677–687.

19. Normally an environmental impact statement on a nuclear power plant is prepared after an applicant seeks a construction permit. *See* 10 C.F.R. Part 50, App. D (1973). When announcing the national commitment to construction of the first LMFBR demonstration plant by 1980, however, the President asked for immedi-

ate preparation of an impact statement. *See* 117 Cong.Rec., *supra* note 9, at 18201.

20. Joint Hearings on Operation of National Environmental Policy Act before Senate Committee on Public Works and Senate Committee on Interior and Insular Affairs, 92d Cong., 2d Sess. (hereinafter NEPA Hearings), 97 (1972) (statement of Dr. James R. Schlesinger, Chairman, AEC).

21. Brief for appellees at 34. It is clear that this commitment to provide an overall environmental assessment within individual facility impact statements was not carried out "to the fullest extent possible" in the impact statement on the first demonstration plant. Its analysis of the environmental implications of the overall program clearly does not present all avail-

But directly undercutting this approach, the Commission's brief quotes approvingly from testimony of Chairman Schlesinger:

> "We think that it would be a big mistake to attempt to freight on a single environmental report on a single facility, all of these broader considerations; [but] the public has a right to know, concerned citizens have the right to know, what the broader future implications may be of the cumulative impact of a number of such facilities, rather than looking at each facility microscopically." [22]

In this context the Commission assures us that it is now preparing "a comprehensive environmental survey of the LMFBR, analyzing the direct impact of the potential plants and the broader implications of the program." [23] But while this "environmental survey" would apparently discuss many of the same kinds of issues as would a NEPA statement, it remains unclear, even after oral argument, whether the Commission proposes to issue it as a NEPA statement and whether the Commission will observe NEPA's requirements as to contents or the procedures to be followed for drafting and issuing the statement.

Elsewhere in its brief, however, the Commission seems to concede that at some point in time a NEPA statement for the entire program would be required. "Most assuredly, the AEC is not declaring its intention to *never* file a detailed statement for the overall program." [24] In this context the Commission argues that the program has not yet reached that stage where a NEPA statement on the overall program would be either feasible or meaningful. "[T]he remote and speculative nature of the project" [25] and the fact that it "remains uncrystallized in form and undetermined in application," [26] lead the Commission to conclude that any detailed analysis at the present time of the overall program, its environmental effects, and alternatives thereto would require the Commission "to look into the crystal ball" [27] and "would be meaningless in terms of content." [28]

The remainder of this section will focus on the Commission's first line of defense—the applicability of NEPA to technology research and development programs and the possibility of substituting an "environmental survey" for a NEPA statement. The following section will discuss the Commission's second argument—the timing of a NEPA statement on the overall program. [29]

■ The Commission takes an unnecessarily crabbed approach to NEPA

---

able information, *see* note 78 *infra*, and its evaluation of alternative energy options is extremely superficial, even to untutored eyes. The Commission itself appears to concede that it has not done the best job possible, since it has already initiated another thorough study of the overall environmental consequences of the breeder program. See text at p. 1097 *infra*.

22. NEPA Hearings, *supra* note 20, at 98–99.

23. Brief for appellees at 14. *See also* text at p. 1097 *infra*.

24. Brief for appellees at 36 (emphasis in original).

25. *Ibid.*

26. *Id.* at 34.

27. *Id.* at 12, *quoting* NEPA Hearings, *supra* note 20, at 99.

28. *Id.* at 34.

29. Before turning to the merits, we here consider two preliminary defenses raised by the AEC relating to whether this case presents a justiciable case or controversy and whether appellant organization has standing to maintain this action. In arguing that the case is nonjusticiable, the AEC mischaracterizes the issues before us. We are not called upon to decide whether it would be wiser for Congress to appropriate funds for some promising energy technology other than the LMFBR. Certainly if a NEPA statement is prepared for the overall program, Congress would hopefully consider the AEC's analysis in deciding whether to appropriate more funds for the program. But this does not make the question before us political in nature.

Nor is it significant that this case concerns an overall agency program rather

in assuming that the impact statement process was designed only for particular facilities rather than for analysis of the overall effects of broad agency programs. Indeed, quite the contrary is true.

"Individual actions that are related either geographically or as logical parts in a chain of contemplated actions may be more appropriately evaluated in a single, program statement.

Such a statement also appears appropriate in connection with * * * the development of a new program that contemplates a number of subsequent actions. * * * [T]he program statement has a number of advantages. It provides an occasion for a more exhaustive consideration of effects and alternatives than would be practicable in a statement on an individual action. It ensures consideration of cumulative impacts that might

than a single specific action. While it is true that the policies, programs and plans of an agency do "not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character," Ashwander v. TVA, 297 U.S. 288, 324, 56 S.Ct. 466, 472, 80 L.Ed. 688 (1936), the AEC's LMFBR certainly passes this requirement of justiciability. The AEC has already begun step-by-step implementation of the program. This program has life, not only in the minds of AEC scientists, but through actions already being carried out. Traditional principles of ripeness dictate that judicial resources be reserved for problems which are real and present, not hypothetical and remote. *See* 3 K. Davis, Administrative Law Treatise 116 (1958). The instant case is ripe under these principles since the issue tendered for review is whether an impact statement on the AEC's LMFBR program is *presently* required under NEPA. That the statement itself would consider the future effects of the program does not detract from the ripeness of this legal issue. The basic thrust of NEPA is to require consideration of environmental effects of proposed agency action long enough before that action is taken so that important agency decisions can meaningfully reflect environmental concerns. In the context of a long-range program such as is involved here, judicial review of compliance with NEPA is necessary at stages at which significant resources are being committed, lest the statute's basic purpose be thwarted. *See* text at pp. 1093–1094 *infra.*

With respect to appellant's standing to sue, we think appellant has alleged sufficient "injury in fact" to satisfy the standing test recently set out by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). As this court has already had occasion to note, the *Sierra Club* decision retained the principle of a modernized law of standing which embraces in-

jury in fact to other than economic interests. *See* Environmental Defense Fund, Inc. v. EPA, 150 U.S.App.D.C. 348, 350–351 n. 1, 465 F.2d 528, 530–531 n. 1 (1972). Unlike the Sierra Club, which failed to allege that it or any of its members would be affected in any of their activities by the federal action in question, *see* 405 U.S. at 735, 92 S.Ct. 1361, the plaintiff organization in this case has clearly alleged and demonstrated that it and its members are adversely affected by the AEC's decision not to draft an impact statement on the overall LMFBR program.

The activities of the plaintiff organization in this case, as described in a memorandum submitted to the District Court on the standing issue, include making available to the public scientific information relevant to important social issues and stimulating and informing public discussion of the scientific aspects of questions of public policy. The AEC's decision not to provide an impact statement on the overall LMFBR program has an adverse effect on these organizational activities by limiting appellant's ability to provide the public information on the LMFBR program. Appellant thus has alleged and shown more than the "mere 'interest in a problem'" held insufficient in *Sierra Club*. *See* 405 U.S. at 739, 92 S.Ct. 1361. Any other approach to standing in the context of suits to ensure compliance with NEPA for long-range Government programs not yet resulting in injury to discrete economic, aesthetic or environmental interests would insulate administrative action from judicial review, prevent the public interest from being protected through the judicial process, and frustrate the policies Congress expressed in NEPA, a result clearly inconsistent with the Supreme Court's approach to standing. *See* 405 U.S. at 740, 92 S.Ct. 1361. Accordingly, we believe the District Court was correct in finding that appellant has standing.

be slighted in a case-by-case analysis. And it avoids duplicative reconsideration of basic policy questions. \* \* \* " [30]

We think it plain that at some point in time there should be a detailed statement on the overall LMFBR program. The program comes before the Congress as a "proposal for legislation" each year, in the form of appropriations requests by the Commission. And as the Council on Environmental Quality has noted in its NEPA Guidelines, the statutory phrase "recommendation or report on proposals for legislation" includes "[r]ecommendations or favorable reports relating to legislation *including that for appropriations*." [31] In addition, the program constitutes "major Federal action" within the meaning of the statute.

The statutory phrase "actions significantly affecting the quality of the environment" is intentionally broad, reflecting the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency.[32] The legislative history of the Act indicates that the term "actions" refers not only to construction of particular facilities, but includes "project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs \* \* \*." [33] Thus there is "Federal action" within the meaning of the statute not only when an agency proposes to build a facility itself,[34] but also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment.[35] NEPA's impact statement procedure has been held to apply where a federal agency approves a lease of land to private parties,[36] grants licenses and permits to private parties,[37] or approves and funds state highway projects.[38] In each of these instances

---

30. Council on Environmental Quality (hereinafter CEQ), Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements (May 16, 1972) (hereinafter CEQ, NEPA Memorandum), reprinted in 3 BNA Environment Reporter 82, 87. *See* CEQ, Third Annual Report 233–234 (Aug. 1972) ; *id.* at 227:

"Changes in individual projects are only a partial index of NEPA's impact. Perhaps a more important sign is that agencies are reviewing their policies to determine the need for across-the-board changes affecting entire Federal programs."

*See also* CEQ, Statements on Proposed Federal Actions Affecting the Environment: Guidelines, 36 Fed.Reg. 7724, 7726 (Guideline 10(a)) (April 23, 1971) (hereinafter cited as CEQ, NEPA Guidelines) :

"Agencies will need to identify at what stage or stages of a series of actions relating to a particular matter the environmental statement procedures of this directive will be applied. It will often be necessary to use the procedures both in the development of a national program and in the review of proposed projects within the national program. \* \* \*"

31. CEQ, NEPA Guidelines, *supra* note 30, 36 Fed.Reg. at 7724 (Guideline 5(a)(i)) (emphasis added).

32. *See generally* Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1, 146 U.S.App.D.C. at 36–37, 449 F.2d at 1112–1113.

33. S.Rep. No. 91–296, 91st Cong., 1st Sess., 20 (1969), U.S.Code Cong. & Admin. News 1969, p. 2751. *See also* CEQ, NEPA Guidelines, *supra* note 30, 36 Fed. Reg. at 7724 (Guideline 5(a)(i)).

34. *See, e. g.,* Environmental Defense Fund, Inc. v. Corps of Engineers of U.S. Army, E.D.Ark., 325 F.Supp. 728 (1971).

35. "NEPA's implications are similar where the Government does not undertake or finance activities directly but regulates the private concerns that do." CEQ, Third Annual Report, *supra* note 30, at 225.

36. *See, e. g.,* Davis v. Morton, 10 Cir., 469 F.2d 593 (1972).

37. *See, e. g.,* Greene County Planning Board v. FPC, 2 Cir., 455 F.2d 412, *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L. Ed. 90 (1972) ; Scenic Hudson Preservation Conference v. FPC, 2 Cir., 453 F.2d 463, 481 (1971) ; Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1.

38. *See, e. g.,* Lathan v. Volpe, 9 Cir., 455 F.2d 1111 (1971).

the federal agency took action affecting the environment in the sense that the agency made a decision which permitted some other party—private or governmental—to take action affecting the environment. The Commission does precisely the same thing here by developing a technology which will permit utility companies to take action affecting the environment by building LMFBR power plants. Development of the technology serves as much to affect the environment as does a Commission decision granting a construction permit for a specific plant. Development of the technology is a necessary precondition of construction of any plants.

▮ ·Application of NEPA to technology development programs is further supported by the legislative history and general policies of the Act. When Congress enacted NEPA, it was well aware that new technologies were a major cause of environmental degradation. The Act's declaration of policy states:

"The Congress [recognizes] the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of * * * new and expanding technological advances * * *. * * * *" [39]

And the Senate report notes, as one of the conditions demanding greater concern for the environment:

"A growing technological power which is far outstripping man's capacity to understand and ability to control its impact on the environment." [40]

NEPA's objective of controlling the impact of technology on the environment cannot be served by all practicable means, see 42 U.S.C. § 4331(b) (1970), unless the statute's action forcing impact statement process [41] is applied to ongoing federal agency programs aimed at developing new technologies which, when applied, will affect the environment. To wait until a technology attains the stage of complete commercial feasibility before considering the possible adverse environmental effects attendant upon ultimate application of the technology will undoubtedly frustrate meaningful consideration and balancing of environmental costs against economic and other benefits. Modern technological advances typically stem from massive investments in research and development, [42] as is the case here. Technological advances are therefore capital investments and, as such, once brought to a stage of commercial feasibility the investment in their development acts to compel their application. [43]

39. National Environmental Policy Act, § 101(a), 42 U.S.C. § 4331(a) (1970).

40. S.Rep. No. 91–296, supra note 33, at 6.

41. Calvert Cliffs' Coordinating Committee v. USAEC, supra note 1, 146 U.S.App.D.C. at 36–37, 449 F.2d at 1112–1113.

42. It has recently been estimated that the United States Government spends $16 billion annually on scientific research and development. See Green, Technology Assessment and the Law: Introduction and Perspective, 36 Geo.Wash.L.Rev. 1033, 1038 (1968).

43. Not only are options foreclosed by commitment of resources to a developing technology, see, e. g., National Academy of Sciences, Technology: Processes of Assessment and Choice 47, 93 (1969), but vested interests in particular technologies often result from government-sponsored technology development. See Green, su-

pra note 42, at 1039; Wollan, Controlling the Potential Hazards of Government-Sponsored Technology, 36 Geo.Wash.L.Rev. 1105, 1134 (1968). Cf. National Academy of Sciences, supra, at 80, emphasizing the lack of neutrality of government agencies in evaluating the risks and benefits of their own technology development programs. Thus an agency like AEC, which has a statutory mandate to develop nuclear technologies, see 42 U.S.C. §§ 2013, 2014(x), 2051(a)(4) (1970), may minimize the possible adverse effects of its technology development programs. Such potential bias is a further reason for applying NEPA's impact statement procedure, as this ensures full disclosure of environmental risks and permits other interested parties—public and private—to evaluate the risks and benefits of the program on their own. See text at p. 1091 infra.

Once there has been, in the terms of NEPA, "an irretrievable commitment of resources" in the technology development stage, the balance of environmental costs and economic and other benefits shifts in favor of ultimate application of the technology.[44] This explains why, in its recently issued Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements, the CEQ recommends:

> "* * * In many cases, broad program statements will be appropriate, assessing * * * the overall impact of a large-scale program or chain of contemplated projects, *or the environmental implications of research activities that have reached a stage of investment or commitment to implementation likely to restrict later alternatives. * * ** "[45]

Applying the logic of this guideline to the present case, because of the long lead times necessary for development of new commercially feasible technologies for production of electrical energy, the decisions our society makes today as to the direction of research and development will determine what technologies are available 10, 20, or 30 years hence

when we must apply some new means of producing electrical energy or face the alternative of energy rationing, through higher prices or otherwise. The manner in which we divide our limited research and development dollars today among various promising technologies in effect determines which technologies will be available, and what type and amount of environmental effects will have to be endured, in the future when we must apply some new technology to meet projected energy demand.

In a very practical sense, then, the Commission's LMFBR program affects the quality of the environment. That the effects will not begin to be felt for several years, perhaps over a decade, is not controlling, for the Act plainly contemplates consideration of "both the long- and short-range implications to man, his physical and social surroundings, and to nature, * * * in order to avoid to the fullest extent practicable undesirable consequences for the environment." [46] The Environmental Protection Agency concurs in the view that an assessment of the total LMFBR program is desirable. In its comments on the Commission's draft statement for

---

44. *Compare* Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1, 146 U.S.App.D.C. at 52, 449 F.2d at 1128, where we held that consideration of environmental issues could not be delayed from the construction permit stage to the operating license stage since commitment of resources in constructing the facility would "inevitably restrict the Commission's options" and would make consideration of environmental factors at the operating license stage "a hollow exercise." *See also* Lathan v. Volpe, *supra* note 38, 455 F.2d at 1120–1121, where, with respect to Department of Transportation approval of a particular section of interstate highway, the court held that preparation of an impact statement could not be put off until the final approval stage since "[o]nce the highway-planning process has reached these latter stages, flexibility in selecting alternative plans has to a large extent been lost."

45. CEQ, NEPA Memorandum, *supra* note 30, 3 BNA Environment Reporter at 87 (emphasis added).

46. CEQ, NEPA Guidelines, *supra* note 30, 36 Fed.Reg. at 7724 (Guideline 2). The concern for long-range planning is also reflected in NEPA's declaration of policy, *see* 42 U.S.C. § 4331(b)(1):

> "* * * [I]t is the continuing responsibility of the Federal Government * * * to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—
> "(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations [.]"

*See also* S.Rep. No. 91–296, *supra* note 33, at 8; *id.* at 5:

> "* * * Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades."

It is also interesting to note that radiation hazards was one of the specific problem areas noted in NEPA's legislative history. *Id.* at 4.

the first LMFBR demonstration plant, the EPA stated:

"Because of the importance of the LMFBR program, we believe that a thorough and timely evaluation of the overall environmental effects of a national commitment to this concept of electricity generation is warranted. Since the results of the demonstration program could influence a decision to use LMFBR's on a broad scale, we encourage you to fully examine all the environmental effects associated with a national commitment to use LMFBR's to generate electricity as soon as practicable." [47]

We thus tread firm ground in holding that NEPA requires impact statements for major federal research programs, such as the Commission's LMFBR program, aimed at development of new technologies which, when applied, will significantly affect the quality of the human environment. To the extent the Commission's "environmental survey" would not be issued in accordance with NEPA's procedures for preparation and distribution, it is not an adequate substitute for a NEPA statement. These procedural requirements are not dispensable technicalities, but are crucial if the statement is to serve its dual functions of informing Congress, the President, other concerned agencies and the public of the environmental effects of agency action,[48] and of ensuring meaningful consideration of environmental factors at all stages of agency decision making.[49]

It is apparent, however, that the Commission seeks to avoid issuing its forthcoming "environmental survey" as an impact statement under Section 102, not out of any desire to circumvent NEPA's procedural requirements, but rather because of a fear that Section 102's requirements as to the contents of an impact statement are so strict, particularly as to the need for "detail" in the statement, that any Commission attempt to issue its environmental survey as a NEPA statement would be doomed to failure. While we do not altogether understand the Commission's fears, we feel they are based on certain misapprehensions as to what NEPA requires.

It is now clear that an agency's duties to issue a statement on a project and to consider environmental factors at each stage of agency decision making as to that project are not inherently flexible or discretionary.[50] But we have also recognized that the statute admits of some degree of flexibility and agency discretion in determining the contents of impact statements.[51] The range of actions covered by NEPA, as we have just seen, is exceedingly broad, ranging from, for example, construction of a particular segment of interstate highway to embarkation upon a broad development program of nationwide significance such as the LMFBR program. The issues, format, length and detail of impact statements for actions as diverse as these must of course differ. NEPA is

47. *See* letter from David D. Dominick, Assistant Administrator for Categorical Programs, EPA, to John A. Erlewine, Assistant General Manager for Operations, AEC, reprinted in AEC, Environmental Statement: Liquid Metal Fast Breeder Reactor Demonstration Plant A–1 (April 1972) (hereinafter AEC, LMFBR Impact Statement). *See also* NEPA Hearings, *supra* note 20, at 100 (Senator Gravel):
"I share their concern. I would like to know the environmental implications if we are going to launch a plutonium economy, and the time to know these problems is before we spend billions and billions of dollars, rather than after."

48. *See* Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 11, 458 F.2d 827, 833 (1972) ; Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1, 146 U.S.App.D.C. at 38, 449 F.2d at 1114.

49. *See* Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1, 146 U.S.App.D.C. at 38, 449 F.2d at 1114.

50. *Id.*, 146 U.S.App.D.C. at 36–39, 449 F.2d at 1112–1115.

51. *See* Natural Resources Defense Council, Inc. v. Morton, *supra* note 48, 148 U.S.App.D.C. at 14–16, 458 F.2d at 836–838.

not a paper tiger,[52] but neither is it a straightjacket.[53] Drafting a proper impact statement involves much more than filling in the blanks on a government form. NEPA statements can and do vary, from relatively short and simple analyses of the environmental effects of smaller projects to complex multi-volume works for projects of multi-billion-dollar dimensions.

Certainly NEPA does not require the Commission to forecast the deployment and effects of LMFBR power reactors in the year 2000 in the same detail or with the same degree of accuracy as another agency might have to forecast the increased traffic congestion likely to be caused by a proposed highway. Conversely, the Commission may well be expected to devote more resources toward preparation of an impact statement for its multi-billion-dollar program than it would for a project involving a federal investment many times smaller.

Similarly, Section 102(C)'s requirement that the agency describe the anticipated environmental effects of proposed action is subject to a rule of reason. The agency need not foresee the unforseeable, but by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting. And one of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry." "The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible * * *." [54] But implicit in this rule of reason is the overriding statutory duty of compliance with impact statement procedures to "the fullest extent possible." [55]

Accordingly, if the Commission's environmental survey is prepared and issued in accordance with NEPA procedures, and if the Commission makes a good faith effort in the survey to describe the reasonably foreseeable environmental impact of the program, alternatives to the program and their reasonably foreseeable environmental impact, and the irreversible and irretrievable commitment of resources the program involves, we see no reason why the survey will not fully satisfy the requirements of Section 102(C). The resulting document may look very different from the impact statement the Commission is used to issuing for a particular nuclear power plant, but this variance should be accepted as a healthy reflection of NEPA's broad scope. It should not be twisted into an excuse for not complying with NEPA at all.

So long as the above described NEPA analysis of the overall program is prepared, we think it of little moment whether that analysis is issued as a separate NEPA statement or whether it is included within a NEPA statement on a particular facility. Questions of format such as these properly reside within the discretion of the issuing agency. To the extent the matter is of any significance, we agree with former Chairman Schlesinger that it would be a "mistake to at-

52. *See* Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1, 146 U.S. App.D.C. at 38, 449 F.2d at 1114.

53. *Compare* Natural Resources Defense Council, Inc. v. Morton, *supra* note 48, 148 U.S.App.D.C. at 15, 458 F.2d at 837.

54. *Ibid.*

55. *See* Calvert Cliffs' Coordinating Committee v. USAEC, *supra* note 1, 146 U.S. App.D.C. at 38–39, 449 F.2d at 1114–1115.

tempt to freight * * * a single environmental report on a single facility" with the broader considerations necessarily involved in an impact statement on the overall program.[56] The issues discussed in an analysis of the overall program would be quite different from those discussed in an analysis of a particular facility, and the relevant audiences, both in government and outside, would vary for each analysis. It would thus seem to make more sense to issue a separate statement for the overall project. This view· is shared by the CEQ, which has suggested that in situations such as that faced here the agency should issue a broad program statement on the overall impact of the program, in addition to subsequent statements on major individual actions to cover those localized environmental impacts that were not fully evaluated in the program statement.[57]

### III. TIMING THE NEPA STATEMENT

Whether a statement on the overall LMFBR program should be issued now or at some uncertain date in the future is the most difficult question presented by this case. It was especially troubling to the District Court, as reflected in the following colloquy with counsel for appellant:

"I say this: I say there comes a time, we start out with E equals $MC^2$, we both agreed you don't have to have the impact statement then. Then there comes a time when there are a thousand of these breeder plants in existence all over the country.

"Sometime before that, surely as anything under the present law, there has to be an impact statement, and a long time before that, actually.

"But the question is, exactly where in this chain do we have to have an impact statement."

In our view, the timing question can best be answered by reference to the underlying policies of NEPA in favor of meaningful, timely information on the effects of agency action. In the early stages of research, when little is known about the technology and when future application of the technology is both doubtful and remote, it may well be impossible to draft a meaningful impact statement. Predictions as to the possible effects of application of the technology would tend toward uninformative generalities,[58] arrived at by guesswork rather than analysis. NEPA requires predictions, but not prophecy,[59] and impact statements ought not to be modeled upon the works of Jules Verne or H. G. Wells. At the other end of the spectrum, by the time commercial feasibility of the technology is conclusively demonstrated, and the effects of application of the technology certain, the purposes of NEPA will already have been thwarted.[60] Substantial investments will have been made in development of the technology and options will have been pre-

56. *See* text at p. 1086 *supra.*

57. *See* CEQ, Third Annual Report, *supra* note 30, at 234; CEQ, NEPA Memorandum, *supra* note 30.

58. *Cf.* CEQ, NEPA Memorandum, *supra* note 30, 3 BNA Environment Reporter at 87: "A program statement will not satisfy the requirements of Section 102, however, if it is superficial or limited to generalities." See also *ibid.*: "If * * * the program [is] too far removed from actual implementation, the resulting analysis is likely to be too general to prove useful."

59. *Cf.* International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 438, 478 F.2d 615, 642 (1973).

60. "* * * The Council [on Environmental Quality] believes that the consideration of environmental factors will be most effective if it comes in the early stages of program and project formulation. If the 102 process is not closely integrated at this early point, it risks becoming an overlay upon agency decisionmaking. And it tends to serve as a post facto justification of decisions based on traditional and narrow grounds. * * *"
CEQ, Third Annual Report, *supra* note 30, at 246. *See also* note 44 *supra.*

cluded without consideration of environmental factors. Any statement prepared at such a late date will no doubt be thorough, detailed and accurate, but it will be of little help in ensuring that decisions reflect environmental concerns. Thus we are pulled in two directions. Statements must be written late enough in the development process to contain meaningful information, but they must be written early enough so that whatever information is contained can practically serve as an input into the decision making process.

 Determining when to draft an impact statement for a technology development program obviously requires a reconciliation of these competing concerns. Some balance must be struck, and several factors should be weighed in the balance. How likely is the technology to prove commercially feasible, and how soon will that occur? To what extent is meaningful information presently available on the effects of application of the technology and of alternatives and their effects? To what extent are irretrievable commitments being made and options precluded as the development program progresses? How severe will be the environmental effects if the technology does prove commercially feasible?

 Answers to questions like these require agency expertise, and therefore the initial and primary responsibility for striking a balance between the competing concerns must rest with the agen-

cy itself, not with the courts.[61] At the same time, however, some degree of judicial scrutiny of an agency's decision that the time is not yet ripe for a NEPA statement is necessary in order to ensure that the policies of the Act are not being frustrated or ignored. Agency decisions in the environmental area touch on fundamental personal interests in life and health, and these interests have always had a special claim to judicial protection.[62]

 The first function of judicial review in this area should be to require the agency to provide a framework for principled decision making.[63] Agencies engaging in long-term technology research and development programs should develop either formal or informal procedures for regular, perhaps annual, evaluation of whether the time for drafting a NEPA statement has arrived.[64]

 More importantly, when the agency has decided that a NEPA statement is not yet necessary, it should state reasons for its decision. The value of such a statement of reasons is becoming generally recognized as courts and agencies grapple with the difficult task of developing procedures for compliance with NEPA. In Hanly v. Kleindienst, 2 Cir., 471 F.2d 823 (1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973), for example, the General Services Administration issued a 25-page "Assessment of the Environmental Impact" to justify its conclusion that a proposed downtown jail facility would have no significant effect on the quality

61. *See* Citizens Assn of Georgetown, Inc. v. Zoning Comm'n of D.C., 155 U.S.App. D.C. 233, 239, 477 F.2d 402, 408 (1973). *Cf.* Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 145, 479 F.2d 842, 866 (1973); Thompson v. Clifford, 132 U.S. App.D.C. 351, 364, 408 F.2d 154, 167 (1968).

62. Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 88, 439 F.2d 584, 598 (1971).

63. *Ibid.*

64. *Compare* the recently promulgated regulations governing preparation of impact

statements by the EPA. "Proposed and certain ongoing Agency actions * * * shall be subjected to an environmental review. This review shall be a continuing one and should commence at the earliest possible point in the development of the project. It shall consist of a study of the proposed program or project which identifies and evaluates the expected and potential environmental impacts of the action and alternatives to it. It will determine whether a significant impact is anticipated from the proposed action." 38 Fed.Reg. 1696, 1698 (Feb. 16, 1973), *amending* 40 C.F.R. § 6.21(a) (1972).

of the environment. Similarly, the regulations of the Environmental Protection Agency require that agency to issue a negative declaration when an environmental assessment indicates there will be no significant impact, accompanied by an appraisal documenting the agency's reasons for concluding that no statement is required.[65]

A statement of reasons will serve two functions. It will ensure that the agency has given adequate consideration to the problem and that it understood the statutory standard. In addition, it will provide a focal point for judicial review of the agency's decision, giving the court the benefit of the agency's expertise.[66] In the present case the Commission has not established any procedure to evaluate its ongoing LMFBR program under NEPA. The Commission's basic position throughout this case seems to be that NEPA does not apply at all to overall research and development programs, but rather only to specific facilities. To the extent the Commission's decision not to write a statement for its program represents instead a decision that the time is not yet ripe for such a statement, the Commission has not given reasons for its decision. Nor are the *post hoc* rationalizations of Commission counsel of much value as a substitute.[67] As indicated earlier, the reasons given in this case are ambiguous and inconsistent. And even if they were not, we would have no way of knowing whether they reflect the reasons actually relied upon by the Commission.

We must, therefore, resort to other material in the record to determine whether the Commission properly decided not to draft a statement for the overall program at the present time. Fortunately a substantial record was made before the District Court, consisting in large part of analyses and reports completed by the Commission itself. Our examination of this record leads us to conclude that the Commission could have no rational basis for deciding that the time is not yet ripe for drafting an impact statement on the overall LMFBR program.[68] Consideration of each of the facts set out in our balancing test point

---

65. *Id.* at 1699, *amending* 40 C.F.R. § 6.25 (a) (1972).

66. *See* Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed. 2d 312 (1968); Citizens Assn of Georgetown, Inc. v. Zoning Comm'n of D. C., *supra* note 61, 155 U.S.App.D.C. at 239, 477 F.2d at 408; Environmental Defense Fund, Inc. v. Ruckelshaus, *supra* note 62, 142 U.S.App.D.C. at 88, 439 F.2d at 598.

67. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Burlington Truck Lines v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

68. The decision whether the time is ripe for a NEPA statement on an overall research and development program is a mixed question of law and of fact. It concerns a question of law as to interpretation of the statutory phrase "major Federal action significantly affecting the quality of the human environment" as it pertains to technology research and development programs. As indicated in text, we interpret the statute to provide for a balancing approach which takes into account the Act's policies in favor of information which is both meaningful and timely. In addition, the decision involves a question of fact as to application of that balancing test to the realities of a specific program at a specific time.

With respect to judicial review of such mixed questions of law and fact, the Supreme Court has authorized a practical standard of review, the "rational basis" test, under which the court will reverse the agency's decision if it has no warrant in the record and no reasonable basis in law. NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Hanly v. Kleindienst, 2 Cir., 471 F.2d 823, 829 (1972).

In reviewing an agency decision that no impact statement was required for certain proposed federal action, the 2nd Circuit has recently rejected this approach in favor of the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A) (1970), as that test was interpreted by the Supreme Court in Citizens to Preserve Overton Park, Inc.

in the direction of drafting an impact statement now.

To begin with, commercial implementation of LMFBR technology is far from speculative. The massive amounts of money being pumped into this program by Congress and the Presidential Energy Policy -statement committing the nation to completion of the first commercial-sized demonstration plant by 1980 both indicate widespread confidence that the program will succeed in its twin goals of demonstrating the commercial feasibility of the breeder reactor and producing an industrial infrastructure ready, willing and able to construct such reactors on a commercial basis. The Commission also has a great deal of confidence in the program. As the Director of the Commission's Division of Reactor Development and Technology stated in the introduction to the LMFBR Program Plan:

"Sufficient experience exists to provide assurances that each complex element of the LMFBR program, if carefully pursued in a diligent and disciplined manner, can produce a viable industrial capability which will provide LMFBR plants on a self-sustaining competitive basis at a minimum cost, and in a timely manner.
* * * " 69

Nor do we think completion of the program may be termed remote. While 10 years may seem a long time in other contexts, by 1968 the Commission already had a carefully planned and detailed schedule for the LMFBR program through the year 1980.70

Secondly, the Commission's own documents indicate that there already exists much meaningful information on the reasonably foreseeable environmental impact of development of LMFBR technology. The impact statement for the first demonstration plant, for example, contains detailed estimates of the radioactive wastes produced annually by a single commercial-scale LMFBR electrical power plant. It also contains estimates of the amount of land area necessary for short- and long-term storage of

v. Volpe, *supra* note 67. *See* Hanly v. Kleindienst, *supra*, 471 F.2d at 828–830.

We think it largely irrelevant which standard of review is verbalized in the context of the instant case. Under *Overton Park* the court must first delineate the scope of the agency's authority and discretion under the governing statute and then determine "whether on the facts the [agency's] decision can reasonably be said to be within that range." 401 U.S. at 416, 91 S.Ct. at 823. Under the rational basis test, the court would have to determine whether the agency's decision had "reasonable support in relation to the statutory purpose." *See* Hardin v. Kentucky Utilities Co., 390 U.S. 1, 9, 88 S. Ct. 651, 19 L.Ed.2d 787 (1968). In the present case, the scope of the AEC's authority and discretion in determining when to draft a NEPA statement for its research and development program is defined specifically by reference to the underlying statutory purpose of timely and meaningful impact statements and, as a result, the two standards of review merge into one.

69. AEC, LMFBR Program Plan, *supra* note 7, at ii. *See also* Authorization Hearings, *supra* note 6, at 672:

"The energy supply and environmental crises have served to underscore the vital importance of expeditiously completing the breeder's development and commercial introduction, in order to assure the great potential economic, environmental, and resource conserving benefits of this reactor type.

"General agreement has developed among most of the key energy community leaders in the cognizant agencies of the Government, in the Congress and in the nuclear community that the breeder reactor is the major long-term solution to the energy supply and related environmental problems. In addition the endorsement by the principal reactor manufacturers and the utilities of the LMFBR program as the highest [priority] energy development program is evidenced by the present commitment of about $25 million per year, and participation of more than 100 private and public utility organizations in cooperative development and design studies with the reactor manufacturers."

Thus the whole tone of discourse about the LMFBR program suggests that commercial implementation of breeder reactor technology is not a question of "if," but rather a question of "when."

70. A chart of the program through 1980 may be found in AEC, LMFBR Program Plan, *supra* note 7, at 1–41.

such wastes.[71] Other studies completed by the Commission contain reasonable estimates of the expected deployment of LMFBR power plants through the year 2000 if the program proceeds on schedule.[72] The overall environmental effects of the program could thus be extrapolated from already existing data. We see no reason why the Commission could not, from information already before us, explore in a NEPA statement such vital matters as, for example, the total amounts of radioactive wastes which will be produced by development of this technology and the total amounts of land area needed for long- and short-term storage of these wastes. The Commission's continual references to "crystal ball inquiry" have a hollow ring in light of the fact that the Commission has already prepared a complex cost-benefit analysis of the LMFBR program, involving projections through and beyond the year 2000.[73] This cost-benefit analysis notably lacks any attempt to quantify the environmental costs or benefits associated with the program so that these factors could play a role in the analysis. The Commission evidently believes its cost-benefit forecasts are accurate enough for use in convincing Congress to fund the program[74] and for use in planning various supporting facilities and fuel production requirements.[75] We think in turn that parallel environmental forecasts would be accurate enough for use in planning how to cope with and minimize the detrimental environmental effects attendant upon deployment of these reactors, and in evaluating the program's overall desirability.

It also seems clear that the Commission has available much information on alternatives to the program and their environmental effects. The Commission's own answer to the complaint in this case, at 9–10, states:

"Alternatives to the LMFBR program have received serious national attention, study and debate. This reactor concept has been under continual review since its conception in the late 1940's. Alternative energy systems have been studied and compared by both governmental and private groups and the conclusion always has been that the LMFBR merits the highest priority within the nation's energy program. * * * "

Similarly, in a speech given in 1971 Commissioner Ramey stated:

" * * * [A] study has been initiated by the AEC to analyze the comparative risks and benefits from each form of electric power generation through the year 2000. We are hoping to have this study completed in about a year. It will include material on the characteristics of the U. S. power industry, the fuel cycles of coal, oil, natural gas and nuclear, a quantification of the effects of these fuels, legal and regulatory influences and what the effects of technological change might be. The goal of this study is to produce a comparison of the advantages and disadvantages of each form of electric power generation through the year 2000." [76]

One would be hard pressed to give a better description of what the discussion of

71. AEC, LMFBR Impact Statement, *supra* note 47, at 88–89.

72. *See generally* AEC, Cost-Benefit Analysis, *supra* note 15; AEC, Nuclear Power, *supra* note 18.

73. *See* AEC, Cost-Benefit Analysis, *supra* note 15.

74. *See* Authorization Hearings, *supra* note 6, at 687–693.

75. *See* AEC, Nuclear Power, *supra* note 18 at 1.

76. "Nuclear Power and Lawyers: What Are the Alternatives?," remarks by Commissioner James T. Ramey, AEC, before the ALI–ABA Course of Study on Atomic Energy Licensing and Regulation, Washington, D. C., Nov. 11, 1971, in Plaintiff's Memorandum in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply to Defendants' Memorandum of Points and Authorities, App. B at 12.

alternatives in a NEPA statement on the overall LMFBR program should look like.

Moving to another factor in our balancing test, it is evident that there are sizable irretrievable commitments of resources taking place in the program. As indicated in the introduction, the federal commitment to this program is now over $100 million per year. The Commission itself admits that one of the results of this commitment has been to slow down development of other new technologies, such as alternative breeder reactor concepts, which would also require a large investment to move from the stage of technical and theoretical research into a stage of commercial feasibility.[77]

Finally, we cannot ignore the fact that the anticipated effects of the LMFBR program on the environment are among the most significant, and most controversial, of all federal programs. We deal here with a radical change in the manner in which our entire nation produces electricity. In many respects, no doubt, this new technique of producing electricity will be less harmful to the environment than present fossil fuel generating plants. But it is evident that the program presents unique and unprecedented environmental hazards. The Commission itself concedes it is expected that by the year 2000 some 600,000 cubic feet of high-level concentrated radioactive wastes will have been generated.[78] These wastes will pose an admitted hazard to human health for hundreds of years, and will have to be maintained in special repositories. The environmental problems attendant upon processing, transporting and storing these wastes, and the other environmental issues raised by widespread deployment of LMFBR power plants, warrant the most searching scrutiny under NEPA.

Of course, some of the environmental impacts of the program are still shrouded in uncertainty. But one of the functions of an impact statement is to point up uncertainties where they exist. And whatever statement is drafted by the Commission can be amended to reflect newly obtained information as the program progresses.[79]

## IV. CONCLUSION

At this point it is appropriate that we emphasize the limited nature of the issue under review in this case. By our holding we do not intend in any way to question either the wisdom of the Commission's LMFBR program or the Commission's dedication to protection of the public health and safety. But as one commentator has noted:

"It is obvious that government programs for development of technology do not proceed in callous disregard of the public welfare. It is equally obvious, however, that in the process of balancing benefits against risks, the government sponsors of technological programs are making decisions as to whether the public may be asked to assume certain risks or burdens which are determined to be 'reasonable' or not 'undue.' Since such determinations are presently made within small closed circles of experts who have a vested interest in the technology, the basic question is whether the public

77. *See* Authorization Hearings, *supra* note 6, at 676. *See also id.* at 672 (remarks of Rep. Holifield). It has also been suggested that commitment of energy technology research dollars to the AEC has hindered development of other promising energy alternatives, such as coal gasification. *See id.* at 529–530.

78. This figure comes from the AEC's answer to the complaint in this case. Notably, information of this nature is not presented in the AEC's environmental impact statement on the first demonstration plant, confirming its inadequacy as an evaluation of the environmental implications of the overall *LMFBR* program.

79. "The program statement can, of course, be supplemented or updated as necessary to account for changes in circumstances or public policy * * *." CEQ, NEPA Memorandum, *supra* note 30, 3 BNA Environment Reporter at 87.

itself would be willing to assume these risks and burdens for the sake of obtaining the promised benefits." [80]

So far as the human environment is concerned, NEPA has provided a means of answering this "basic question" by requiring full disclosure to the public and to other entities within government of all environmental effects likely to stem from agency action.

Accordingly, the judgment of the District Court is reversed and the case is remanded to the District Court for entry of appropriate declaratory relief.

So ordered.

---

80. Green, *supra* note 42, 36 Geo.Wash.L.Rev. at 1040–1041.