**AMERICAN PUBLIC TRANSIT ASSOCIATION et al., Plaintiffs,**

v.

**Neil GOLDSCHMIDT et al., Defendants.**

**Civ. A. No. 79–1697.**

United States District Court, District of Columbia.

Feb. 7, 1980.

Barry J. Cutler (argued), David R. Melincoff (on brief), O'Connor & Hannan, Washington, D. C., for plaintiffs.

Charles A. Miller, Carolyn F. Corwin, Covington & Burling, Washington, D. C., for amicus American Association of State Highway and Transportation Officials.

Barbara L. Gordon (argued), Paul Blankenstein (on brief), U. S. Dept. of Justice, Washington, D. C. for defendants; Robert W. Batchelder, Urban Mass Transportation Administration, Washington, D. C., of counsel.

James J. Raggio, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for amicus American Coalition of Citizens With Disabilities, et al.

## MEMORANDUM

OBERDORFER, District Judge.

### I

### A.

Plaintiffs, an association of public transit authorities and a number of association members, brought suit to declare invalid, and to enjoin the implementation of, Department of Transportation ("DOT") regulations governing provisions for handicapped persons in federally-assisted mass transportation programs ("the regulations").[1] The regulations generally require

---

1. 44 Fed.Reg. 31477–31481 (May 31, 1979), codified at 49 C.F.R. Part 27, Subpart E (49 C.F.R. §§ 27.81–27.119 (1979)).

recipients of federal grants for transportation to make each individual mode of transportation supported by federal funds—bus, subway, streetcar, and commuter rail—"accessible" to the handicapped, within stated time periods ranging from three to thirty years. "Accessibility" for purposes of grant eligibility is defined in the regulations for each mode of transportation, usually in terms of accessibility to wheelchair users. To make bus systems accessible as a whole, the grantee must make at least half of all buses accessible to wheelchair users. All "key" stations on subway and commuter rail systems (about 40 percent of all stations), together with at least one vehicle per train, must, unless the requirement is specifically waived, be accessible to wheelchair users; and there must be connector service provided between key stations and all other stations. In addition, all new buses and subway cars acquired after the effective date of the regulations—July 2, 1979—must be accessible to wheelchair users; all new commuter rail cars acquired after January 1, 1983, must be similarly accessible.

Accessibility for each mode of public transportation must be achieved within three years, except that "extraordinarily expensive" structural changes to or replacements of existing vehicles or facilities may be accomplished over longer periods, in some cases as much as 30 years.[2] Some particularly costly structural changes can be waived on application to the Secretary. 49 C.F.R. § 27.99 (1979). Under the regula-

tions, the only major actions that transit authorities must take immediately are to acquire accessible buses and subway cars, if they decide to acquire any new vehicles at all, and to initiate compliance planning. Compliance plans are due 12 to 18 months after the effective date of the regulations.

Federal assistance for mass transit is currently provided under three major programs: the discretionary capital grant program under section three of the Urban Mass Transportation Act ("UMTA"), 49 U.S.C. § 1602 (1976), the formula grant program under section 5 of UMTA, 49 U.S.C. § 1604 (1976), and the interstate substitution program under the Federal Aid Highway Act, 23 U.S.C. § 103(e)(4) (1976). Over three billion dollars per year in authorized federal grants for mass transit under these programs are presently conditioned upon compliance with the DOT regulations. Estimates of the cost of compliance vary from three to seven billion dollars.[3] The federal government would ultimately bear some of these additional costs through increased grants under the Urban Mass Transportation and Federal Aid Highway programs; local transit authorities would bear the remainder.[4] DOT estimates that the costs that would ultimately be borne by local authorities would be about $460 million over 30 years; plaintiffs place the figure at over $4.5 billion for the same period.

The relevant regulations invoke as authority section 504 of the Rehabilitation Act

---

2. The time permitted for accomplishing "extraordinarily expensive" structural changes or replacements is: for bus systems, ten years for both vehicles and fixed facilities; for subway systems, five years for vehicles and 30 years for fixed facilities; for streetcar systems, twenty years for both vehicles and fixed facilities; and for commuter rail systems, ten years for vehicles and thirty years for fixed facilities.

3. DOT predicts that the expense would exceed three billion dollars over the next 30 years. See Transcript of Proceedings, January 18, 1980. The Congressional Budget Office expects that compliance with the regulations would cost almost $7 billion over the 30-year period. See Plaintiffs' Exhibit W.

4. The additional capital and operating expenses that would be incurred in complying with the

DOT regulations would be expenses for which federal assistance is available under both the Urban Mass Transportation Act and the Federal Aid Highway Act. See 49 U.S.C. §§ 1602, 1604; 23 U.S.C. § 103(e)(4). The costs of compliance would, therefore, be borne partly by the federal government and partly by the state and local grant recipients. Recipients would be reimbursed for 80% of the additional capital costs under either UMTA or FAHA. They would be eligible to receive federal assistance for up to 50% of the additional operating costs, although in fact the average amount of aid that the states and localities would probably receive as to the additional operating costs would be about 15%. See Memorandum and Order of September 17, 1979, Findings of Fact ¶ 25.

of 1973, as amended[5] ("section 504"), section 16 of the Urban Mass Transportation Act of 1964, as amended[6] ("section 16"), and section 165 of the Federal-Aid Highway Act of 1973, as amended[7] ("section 165"). Section 504 provides in part that

No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

Section 16 provides

It is hereby declared to be the national policy that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation . . . should contain provisions implementing this policy.

Section 165 provides

that projects [funded under the Federal-Aid Highway Act] shall be planned, designed, constructed and operated to allow effective utilization by elderly or handicapped persons who . . . are unable without special facilities or special planning or design to utilize such facilities and services effectively. The Secretary shall not approve any program or project to which this section applies which does not comply with the provisions of this subsection requiring access to public mass transportation facilities, equipment, and services for elderly or handicapped persons.

In April, 1976, President Ford issued Executive Order 11914, charging the Secretary of HEW with the responsibility to "coordinate the implementation of Section 504 . . . by all Federal departments and agencies . . ." and to "establish standards for determining what are discriminatory practices within the meaning of 504." The Executive Order also directed each agency administering programs providing federal financial assistance to issue its own regulations, consistent with the standards established by the Secretary of HEW. In response to this Presidential directive, HEW promulgated guidelines setting standards for other federal agencies to follow in developing their section 504 regulations. 43 Fed.Reg. 2132 (January 13, 1978), codified at 45 C.F.R. §§ 85.1–85.99 (1978) ("the HEW guidelines").

The HEW guidelines provided generally with respect to program accessibility that

No qualified handicapped person shall, because a recipient's facilities are inaccessible to or unusable by handicapped persons, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance.

45 C.F.R. § 85.56 (1979). More important, however, the guidelines provided with respect to making available to handicapped persons the same things that are available generally that

A recipient . . . may not . . . provide different or separate aid, benefits, or services to handicapped persons than is [sic] provided to others unless such action is necessary to provide handicapped persons with aid, benefits, or services that are as effective as those provided to others.

45 C.F.R. § 85.51(b)(1)(iv) (1979). In addition, the guidelines provided that

A recipient shall operate each program or activity so that . . . when viewed in its entirety, [it] is readily accessible to and usable by handicapped persons. This paragraph does not necessarily require a recipient to make each of its existing

---

5. 29 U.S.C. § 794 (1976 and Supp.).

6. 49 U.S.C. § 1612 (1976 and Supp.).

7. 23 U.S.C. § 142nt (1976).

facilities or every part of its existing facilities accessible to and usable by handicapped persons.

45 C.F.R. § 85.57(a) (1979).

Finally, the HEW guidelines provided that structural changes, determined pursuant to the foregoing to be necessary, should be made within three years

> Provided, that, if the program is a particular mode of transportation (e. g., a subway system) that can be made accessible only through extraordinarily expensive structural changes to, or replacement of, existing facilities and if other accessible modes of transportation are available, the federal agency responsible for enforcing section 504 with respect to that program may extend this period of time . . . for a reasonable and definite period . . . .

45 C.F.R. § 85.57(b) (1978).

On June 8, 1978, the Department of Transportation published a "Notice of Proposed Rulemaking" in the Federal Register, announcing its intention to adopt regulations establishing conditions for federal grants for mass transit systems which would require states and localities to take steps to guarantee non-discriminatory provision of mass transit services to the handicapped. The notice of proposed rulemaking published specific proposals and provided for a 90-day period during which comments from the public on those proposals or any

alternatives would be accepted.[8] In addition, public hearings were held in five cities: New York, Chicago, Denver, San Francisco/Oakland, and Washington, D.C. Six hundred fifty persons and groups submitted written comments in the rulemaking docket; 220 persons and groups made presentations at the hearings.

The final DOT regulations at issue here were adopted on May 31, 1979. The final rule reflects extensive consideration of program accessibility, particularly with respect to bus service. 44 Fed.Reg. 31455–6 (May 31, 1979). The background statement about the final regulations reported 180 comments about whether buses using fixed routes should be made accessible to the handicapped by facilities, lifts and other devices specifically designed and retrofitted (so-called mainline bus service), or whether the Secretary could or should provide transportation for the handicapped by subsidizing "paratransit" or "special service" in the form essentially of door-to-door service by small, specially-rented buses, limousines and taxis. The Secretary considered this issue and decided in 1977 and reaffirmed in the present rule that regularly scheduled buses should be accessible to the handicapped. 44 Fed.Reg. 31456 (May 31, 1979).

The background of the rule reflects consideration of the relative costs and benefits of mainstreaming and special services,[9] as

---

**8.** This was later extended 44 more days until October 20, 1978.

**9.** See section VA, infra. The Notice of Proposed Rulemaking states that the capital costs of the regulation as proposed would be $1.8 billion in 1977 dollars, of which $1.6 billion would represent expenses of altering rail stations, including subway stations. It states that the cost would be $2.7 billion assuming an annual inflation rate of six percent and a 12 year compliance period, and $4.6 billion if the compliance period were 30 years. The Notice of Proposed Rulemaking estimates that total capital and operating costs for the first twelve years, averaged over that period, would be $221.5 million in 1977 dollars, or $360 million if 6% inflation were assumed. It estimates capital and operating expenses after that initial 12 year period as $71.7 million annually in 1977 dollars.

In the section-by-section analysis accompanying the final regulations, DOT notes the rulemaking comment of the plaintiff American Public Transit Association that annual operating costs for "mainline" accessible bus systems would be $300 million compared to $159 million for paratransit service, but states that costs were "likely to be lower than commenters suggested." The analysis questions cost assumptions such as "presumed slowing of service, increased cost for garages (based on presumed need for housing greater numbers of vehicles), increased insurance costs, need for additional personnel [and] training . . . and so forth." It also questions whether the paratransit service compared was truly comparable. The analysis states that the capital cost impact of the bus provisions would "consist principally of incremental costs of lift-equipped buses over the costs of inaccessible new buses; " it does not state what that figure would be. It asserts that the marginal increase in

well as the technological problems involved.[10] One paragraph considered, without detail, whether the use of lifts for wheelchairs would greatly slow bus service. Another paragraph considered whether lifts would pose safety hazards and, finally, whether the lift technology had advanced to the point that lifts would be reliable. In addition, there was reference to the Secretary's earlier (and since abandoned) decision to require grantees to procure the so-called Transbus.[11] The Secretary resolved all these issues in favor of the mainline, as distinguished from special service, solution. The final regulations, in the view of DOT, made the accessibility requirement independent of the Transbus mandate, so that if the Transbus did not materialize (as has since proved to be the case), accessibility would be achieved by lifts, for example, until other technology produced a Transbus or other solution.

The DOT regulations contain a special waiver provision for existing subway, commuter rail, and streetcar systems. Section 27.99 provides that recipients that operate such systems may "petition the Secretary for a waiver of any of [their] obligations under § 27.87 or § 27.89 with respect to accessibility for handicapped persons." 44 Fed.Reg. 31480 (May 31, 1979). The waiver privilege is limited, however, by a provision that waiver requests may only be submitted after all transition plans have been completed (about 12 to 18 months after the effective date of the regulations) and after the metropolitan planning organization and handicapped persons and groups representing handicapped persons have, "through a consultative process, . . . developed arrangements for alternative service substantially as good or better than that which would have been provided absent a waiver." *Id.* The Secretary "may grant such a petition in his or her discretion, provided that the Secretary determines that local alterna-

tive service to handicapped persons will be substantially as good as or better than that which would have been provided by the waived requirement." *Id.* The section-by-section analysis accompanying the regulations significantly elucidates DOT's position with respect to the waiver provision:

The stringent requirements of this section ensure that only meritorious requests for waiver will be granted. It should be noted that the section requires that alternative services "will be" as good as or better than those which would have been provided by the waiver [sic] requirement. Recipients do not have to show that the alternative services, at the time the petition is submitted, are equivalent to the services that would have been provided when program accessibility for the rail system in question had been achieved. Rather, the recipient must demonstrate to the Secretary's satisfaction that within the period established for program accessibility, or a shorter time established by the Secretary in his or her reasonable discretion, the appropriate level of service will be established. *The required alternative service may be provided by any mode or combination of modes, including accessible mainline buses and special service paratransit.*

44 Fed.Reg. 31464 (May 31, 1979) (emphasis supplied).

The waiver provision contained in section 27.99 does not apply to bus systems. There is, however, a general provision applicable to all DOT regulations authorizing DOT to exempt a person, in certain circumstances, from the requirements of one or more regulations. 49 C.F.R. § 5.11 (1978) reads in part

(a) Any person may petition the Secretary . . . for a permanent or temporary exemption from any rule.

(b) Each petition filed under this section must— . . .

---

operating expenses for bus systems would average 1.3%. The analysis states that the cost of bringing subway systems into compliance with the regulations would be $1 billion over 30 years, the cost for commuter rail $290 million

over 30 years, and the cost for streetcar systems $47 million.

**10.** *See* Section VB, *infra.*

**11.** *See* 44 Fed.Reg. 31456–57 (May 31, 1979).

(3) Explain the interest of the petitioner in the action requested including, in the case of a petition for an exemption, the nature and extent of the relief sought and a description of the persons to be covered by the exemption;

(4) Contain any information and arguments available to the petitioner to support the action sought; and

(5) In the case of a petition for exemption, unless good cause is shown in that petition, be submitted at least 60 days before the proposed effective date of the exemption.

In the proceedings on plaintiffs' motion for preliminary injunction, defendants represented that this provision permitted administrative consideration of applications for relief from conditions required by the regulations. In the course of denying plaintiffs' motion for a preliminary injunction, the Court announced its intention to entertain motions by individuals claiming irreparable injury as a result of defendants' denial of exemptions pursuant to the foregoing. Several applications have been filed under this provision; as of January 18, 1980, DOT had not decided any of them.

B.

In November, 1978, after the publication of DOT's Notice of Proposed Rulemaking but before the adoption of the final rule, section 504 was amended to require that all proposed regulations adopted by agencies pursuant to section 504 be submitted to "appropriate authorizing committees of Congress" at least 30 days prior to their effective date. Pub.L. 95–602, §§ 119, 122(d)(2), 92 Stat. 2982, 2987.

Congress also provided in 1978, in section 321 of the Surface Transportation Assistance Act of 1978, that DOT provide funds to transit operators, such as plaintiffs here, to develop "detailed estimates" of the cost of retrofitting their subway, streetcar and commuter rail systems to make them "accessible to and usable by handicapped persons". The statute requires the Secretary to compile and report to Congress by January 30, 1980 "the results" of those studies "together with his recommendation for such legislation as may be necessary to finance the improvements set forth in the cost estimates . . . ." Pub.L. 95–599, § 321, 49 U.S.C. § 1612 nt (Supp.1978).[12] Although the reports were due under the statute on January 30, 1980, DOT notified Congress that they would be completed and forwarded in August, 1980.

In late 1979, about one-half year after the adoption of the final DOT regulations, Congress passed the Department of Transportation and Related Agencies Appropriations Act of 1980, Pub.L. 96–131, 93 Stat. 1023, providing appropriations for DOT programs for fiscal year 1980. Under that Act, $1,380,000 was appropriated for the discretionary capital grant program under section 3 of the Urban Mass Transportation Act, see 93 Stat. 1027, 1032; $1,405,000 for the formula grant program under section 5 of

---

**12.** Section 321 provides more fully that:

Beginning in fiscal year 1979, the Secretary of Transportation shall provide Federal financial assistance . . . to operators of fixed-guideway public mass transportation systems for the purpose of developing detailed estimates of the cost of making improvements to existing fixed-guideway public mass transportation systems to make such systems accessible to and usable by handicapped persons. Not later than January 30, 1980, the Secretary shall compile the results of these evaluations and report to Congress the results, together with his recommendations for such legislation as may be necessary to finance the improvements set forth in the cost estimates. . . .

. . . . .

The Secretary of Transportation shall make an evaluation of the light-rail public mass transportation mode . . . and the commuter rail public mass transportation mode to determine ways to make, and the desirability of making, such modes accessible to and usable by handicapped persons. The Secretary shall report to Congress the results of this evaluation not later than January 30, 1980, together with his recommendations for legislation necessary to clarify or to change Federal laws or provisions pertaining to accessibility requirements affecting the light-rail and commuter rail modes.

Pub.L. 95–599, § 321, 49 U.S.C. § 1612 nt (Supp.1978).

UMTA;[13] and $700,000 under the interstate substitution program of the Federal Aid Highway Act, *see* 93 Stat. 1033. The appropriations act specifically provides that "none of these funds shall be available to retrofit any existing fixed rail transit system to comply with the regulations issued pursuant to section 504 of the Rehabilitation Act of 1973." *See* 93 Stat. 1027, 1032. This restriction applies only to fiscal year 1980; as noted, the time allowed under the DOT regulations for achieving accessibility for fixed rail systems is between 10 and 30 years in most cases.

The House Report accompanying the 1979 appropriation act expressed the Committee's concern that "the regulations [at issue here] might require the expenditure of vast sums with only minimal benefits to handicapped persons." H.R.Rep.No.272, 96th Cong., 1st Sess. 48 (1979) (Committee on Appropriations). The Committee noted that section 321 of the Surface Mass Transportation Act requires "a study of this issue," and stated that pending completion of the study, it would recommend "language . . . prohibit[ing] the use of [federal] funds to retrofit any existing rail transit system." That was the language adopted by Congress.

Similarly, with respect to buses, the Committee Report called on DOT to "evaluate the costs and benefits associated with equipping all regular bus routes with lifts . . . and ensure that any lifts which are currently being purchased with UMTA assistance are reliable, maintainable and operable." *Id.*

In November, 1979, while this case was under submission here, the Congressional Budget Office published a report at the request of the Senate Budget Committee and the Transportation Subcommittee of the House Public Works and Transportation Committee entitled "Urban Transportation for Handicapped Persons: Alternative Federal Approaches." *See* Plaintiffs' Exhibit

W. Referring to the regulations, the report states as a fact that:

> The Congress is currently considering whether to fund these changes through reductions in other transit programs or through new appropriations—or whether to enact new legislation requiring DOT or HEW to modify their rules.

*See id.* at xi. According to the report, there are three alternatives: the plan contemplated by the DOT regulations (the transit plan); a plan to furnish door-to-door services to persons who have difficulty in walking to transit stops, waiting in bad weather, balancing on moving buses, and moving through crowds; and a plan supplementing this latter plan with capital grants to paraplegics and quadriplegics to cover the purchase price of specially-adapted private cars or vans.

The report puts squarely to Congress the necessity of addressing "the economic and budgetary implications of the DOT regulations." The report asserts that

> In examining its options, the Congress will wish to promote the most beneficial transport services for handicapped persons in light of national social and economic objectives.

Thus, by virtue of the provisions of Section 504, requiring delivery of proposed regulations to Congress, Congress' responsibility for funding grants for transportation (including transportation for the handicapped), as recently evidenced in the DOT appropriations act, Pub.L. 96–131, and the Congressional Budget Office Report, the policy, budget and technological questions addressed by the regulations are formally and actually before Congress for review.

**II**

▆ Published information, judicially noticed by the Court, suggests at least some of the potential impact of the new regulations. There are over 3,000 counties in the

---

**13.** *See* 93 Stat. 1027, 1032 ($630,000 appropriated); *see also* H.R.Rep.No.272, 96th Cong., 1st Sess. 49 (1979) (noting that $775,000,000 of previously authorized contract authority becomes available in fiscal year 1980); S.Rep.No. 377, 96th Cong., 1st Sess. 43–44 (1979) (same).

United States,[14] more than 900 incorporated cities with populations in excess of 25,000,[15] and about 275 "metropolitan areas"—that is, areas "in and around a city, in which the activities form an integral economic and social system"—with populations greater than 50,000.[16] In these cities and counties there are more than 3.85 million miles of highways.[17] Six hundred fifty thousand miles of these highways are within cities or other densely populated areas; the remainder are rural.[18] Along those city highways operate approximately 1,000 local bus systems—excluding school bus systems—which use more than 50,000 buses.[19] Along the city and rural highways operate another 1,000 intercity bus systems, using about 20,000 buses.[20] In 1976, buses traveled about 5.8 billion vehicle miles on U.S. highways.[21]

In 1977, buses carried 5.3 billion passengers.[22] Subways, streetcars, and commuter rail carried an additional 2.25 billion.[23] Operating expenses for the passenger transit industry that year exceed 4 billion dollars, leaving a deficit in operating income of about 2 billion dollars.[24]

DOT's Notice of Proposed Rulemaking stated that there are 13 million handicapped persons in the United States. The legislative history of the Urban Mass Transportation Act, the statute providing for federal financial assistance to local public transit operators, includes statements by Congressmen placing the number of handicapped at 44 million. The Congressional Budget Office estimated in a recent study that there are about 35 million handicapped in the U.S., of whom about 409,000 are confined to wheelchairs, and of whom about five million, including those wheelchair users, have

difficulty using public transit. *See* Plaintiffs' Exhibit W, at xi.

A study prepared for DOT completed at approximately the same time as the notice of proposed rulemaking was published reported that there are 7.44 million people in the U.S. who are "transportation handicapped," of whom 1.4 million "cannot use public transportation at all," 2.18 million "can only use public transportation with a lot more difficulty," and 3.86 million "have a little more difficulty using public transportation." *See* Plaintiffs' Exhibit H ("National Survey of Transportation Handicapped Persons") at 10. The study found that the same proportion of transportation handicapped (29%) as nontransportation handicapped (25%) used the public bus systems, but that a smaller proportion used the subway (3% compared to 7%). *Id.*

Although this and myriads of other information about the potential implications of the regulations was readily accessible, the Department prepared a "Final Negative Declaration" to accompany its notice of proposed rulemaking which summarily concluded that the proposed regulations would not "significantly affec[t] the quality of the human environment" under the National Environmental Policy Act so as to require the preparation of an environmental impact statement. The declaration consisted of three and a fraction pages; somewhat less than half was devoted to a discussion of "potential environmental impact." The environmental discussion consisted of two sentences addressed to "noise," three sentences addressed to "air quality," two sentences to "land use and urban growth," four sentences to "historic sites," and one sentence

**14.** *See* County and City Data Book 1977, United States Department of Commerce, Bureau of the Census, at xx, 782–99.

**15.** *See id.* at 802–09.

**16.** *See id.* at xvii, 800–01. The full term used by the Bureau of Census for these units is "standard metropolitan statistical areas."

**17.** *See* Statistical Abstract of the United States 1978, United States Department of Commerce, Bureau of the Census, at 641.

**18.** *Id.*

**19.** *Id.* at 658.

**20.** *Id.* at 659.

**21.** *Id.* at 647.

**22.** *Id.* at 658.

**23.** *Id.*

**24.** *Id.*

to "other." The declaration contained no quantifications of environmental effects.[25] The declaration gave no indication of what, if anything, served as the basis for DOT's conclusion that the proposed regulations would have no significant environmental effects.

The Department also prepared a final negative declaration to accompany the publication of the final regulations. That declaration, slightly over 5 pages in length, is almost identical to the earlier declaration. The second declaration devotes one and a half pages to a discussion of potential environmental effects. The discussions of three of the five categories of environmental effects are unchanged. Two of the three sentences on "air quality" have been deleted. The discussion of "historic sites" adds two sentences describing sections of the Historic Preservation Act and modifies some existing sentences. There are similarly no quantifications of environmental effects, and no mention of any underlying studies or other basis for the negative declaration. The effects of the regulations on the time each bus must stand to permit each handicapped passenger to board and exit, including the environmental consequences of the additional idling of engines during such so-called "dwell time," are neither mentioned nor evaluated in the negative declaration, the reference in the earlier declaration[26] having simply been deleted without comment.

### III

The plaintiffs have challenged the regulations on a number of grounds: first, that they are illegal and in excess of statutory authority; second, that they are procedurally defective under section 553 of the Administrative Procedure Act because DOT did not consider all relevant issues, options, and comments during the rulemaking process; third, that the regulations are arbitrary and capricious in that (a) they fail to recognize limitations on available technology, (b) they impose greater costs but will result in fewer benefits to the handicapped than alternative approaches, and (c) they fail adequately to consider diversity in local conditions, allegedly affecting both the feasibility of compliance and the benefits potentially flowing therefrom; and fourth, that DOT failed adequately to consider the environmental impact of the regulations.[27] The issues so framed are before the Court on cross motions for summary judgment.

For reasons set forth below, the Court has concluded: (1) that the regulations do not exceed statutory authority, (2) that the regulations are not procedurally defective, and (3) that the decision to issue the regulations was not arbitrary and capricious; but (4) that DOT failed to comply with the requirements of the National Environmental Policy Act when it failed to prepare an environmental impact statement to accompany the regulations. With respect to relief, the Court has concluded (5) that, under the standards enunciated by the Supreme Court in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), implementation on the regulations should not be enjoined pending completion of an EIS, particularly in light of the facts that any grantee or other person threatened with irreparable injury because of unevaluated environmental effects may apply to DOT and ultimately to the courts for specific relief, and that Congress is actively con-

---

**25.** The sentences on air quality state that the wheelchair lifts that would have to be installed on buses weigh from 400 to 600 pounds, that buses weigh about 23,000 pounds, and lifts would be installed on an estimated 4,000 buses, after which the Transbus system would go into effect. The declaration does not, however, analyze potential effects of this weight on, for example, fuel consumption or emissions, multiplied as it must be by the thousands of lifts involved.

**26.** *See* Plaintiffs' Exhibit 11 (Final Negative Declaration accompanying Notice of Proposed Rulemaking). The earlier declaration had stated that the potential increase in air emissions due to the increased weight of lift-equipped vehicles "should be more than offset by reduced vehicle dwell time." *Id.* at 3.

**27.** Plaintiffs also advance a number of other claims, but the Court finds none of them sufficiently meritorious to warrant consideration here.

sidering the regulations and the policy decisions there reflected.

## IV

### A.

■ Since 1964, the federal government has provided states and localities with capital and operating assistance for public mass transit programs. In 1970, Congress supplemented its 1964 findings about the transportation requirements of the United States to find that:

> the rapid urbanization and the continued [disbursal] of population and activities within urban areas has made the ability of *all* citizens to move quickly and at a reasonable cost an urgent national problem . . . . It is the purpose of this Act to create a partnership which permits the local community, through Federal financial assistance, to exercise the initiative necessary to satisfy its urban transportation requirements.

49 U.S.C.A. § 1601a (emphasis added). To this end, Congress has given broad discretion and appropriated substantial funds to the Secretary of Transportation to make grants to state and local agencies for their use in providing transportation for "all citizens." The extent of Congress' delegation is evidenced by the large size of the authorizations and appropriations it committed to finance these grants and the broad scope of the Secretary's authority to administer them. Thus, section 3 of the Urban Mass Transportation Act, 49 U.S.C. § 1602, the "discretionary capital grant" program, provides for federal financial assistance for urban mass transportation and authorizes:

> The Secretary . . . in accordance with the provisions of this chapter . . *and on such terms and conditions as the Secretary may prescribe*, to make grants or loans . . . to particular states and local bodies and agencies . . . in financing . . . the acquisition, construction, reconstruction and improvement of facilities and equipment for use . . . in mass transportation service . . ..

49 U.S.C. § 1602(a) (emphasis added). Similarly, section 5 of UMTA, 49 U.S.C. § 1604, the "formula grant" program, provides that

> The Secretary may approve as a project under this section, *on such terms and conditions as he may prescribe*, (A) the acquisition, construction and improvement of facilities and equipment for use, by operation or lease or otherwise, in mass transportation service, and (B) the payment of operating expenses to improve or to continue such service by operation, lease, contract, or otherwise.

49 U.S.C. § 1604(d) (emphasis added).

From time to time, Congress and the Secretary have attached various conditions to the use of funds granted for transportation. Of particular interest here, beginning in 1970, Congress has repeatedly expressed a strong interest in conditioning transportation grants in a way that would make mass transportation services available to handicapped persons. In 1973, Congress declared a national policy that handicapped persons "have the same right as other persons to utilize mass transportation facilities and services." And Congress further declared that:

> special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured . .

Section 16; 49 U.S.C. § 1612(a). This planning provision was supplemented by authorization to the Secretary to make grants and loans to state and local public bodies "for the specific purpose of assisting them in providing mass transportation services which are planned, designed *and carried out* so as to meet the special needs of the elderly and handicapped persons." 49 U.S.C. § 1612(b)(1) (emphasis added).

In 1973, the Congressional policy favoring provision of mass transportation services to "all citizens" was extended to allow the use of highway funds for mass transit projects. Federal Aid Highway Act of 1973, 87 Stat. 250, 23 U.S.C. § 101 et seq. A provision of

that statute reaffirmed the Congressional policy of assuring the elderly and handicapped "mass transportation which they can effectively utilize." In 1975 the statute was amended to require that the mass transit projects assisted with federal highway funds be "constructed and operated" as well as planned and designed to allow effective utilization by the elderly and handicapped. Federal Aid Highway Amendments of 1974, 88 Stat. 2282. This amendment also specifically added the directive that the Secretary "not approve any program or project . . which does not comply with the provisions . . . requiring access to mass transportation facilities, equipment and services for elderly or handicapped persons." Transportation for Elderly and Handicapped Persons Act, Public Law 93–643, section 105(b), January 4, 1975, 88 Stat. 2281.

Congress also declared in 1973 as a matter of general federal policy that

No otherwise qualified handicapped individual in the United States shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

29 U.S.C. § 794 (1976 & Supp.) (Section 504).

The plaintiffs' challenge to the Secretary's statutory authority to issue the regulations here relies heavily on the Supreme Court's decision in *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). The Court there struck down action of the Secretary of HEW because HEW required a grantee to make "substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals." 99 S.Ct. at 2369. *See* Section IV C, *infra*. But HEW based its position in *Davis* entirely upon Section 504. The Secretary's authority here, by contrast, is undergirded by specific statutes delegating to the Secretary of Transportation broad authority to establish terms and conditions for the grants of huge sums for transportation facilities generally and for

transportation for the handicapped in particular. See 49 U.S.C. §§ 1601, 1602, 1604 and 1612, and 23 U.S.C. § 142 nt. Those statutes significantly complement the Secretary's section 504 authority and furnish independent justification for his regulations here. They impose upon the Secretary an affirmative obligation not merely to refrain from discrimination against handicapped persons, but to provide directly for them. *Compare Southeastern Community College v. Davis, supra.*

It may be that the authors of the HEW guidelines assumed they were ruling with respect to transportation solely on the basis of section 504, but the authority of the Secretary of Transportation to adopt regulations with respect to transportation of the handicapped derives not only from § 504, but also from these other statutes vesting in him broad authority with respect to transportation in general and transportation for the handicapped in particular.

These statutes and their legislative history reflect a consistent Congressional charge to the Secretary of Transportation that he attach conditions to grants made from appropriated funds which will, to the extent feasible, make mass transportation available to handicapped persons. The very generality of this Congressional expression establishes the broad delegation of authority to the Executive Branch for implementation of this policy. The law, the heterogeneous character of the handicapped population, the breadth and variety of the states and communities affected, and the uncertain and changing technology available preclude a Congressional prescription of the particular means for carrying out its policy.

The Regulations, issued to carry out this policy, reflect that the Executive Branch, particularly the President and the Departments of HEW and Transportation, surveyed the situation, identified some options, and made a choice among them. They chose to provide access to mass transportation primarily by modifying mass transportation vehicles and facilities to accommodate a substantial segment of the handicapped population. They chose not to rely,

except at the margin, upon individualized service such as would be furnished by subsidizing taxi service or providing special vans for handicapped persons. This choice is reflected in the regulations at issue here.

The wisdom of the choice, and indeed the question whether it is the choice Congress intended, is not free from doubt. But there is substantial basis for it and for the legal judgment which it reflects. The agency's judgment in this regard is entitled to particular respect. More important, perhaps, Congress has the choice under active consideration.[28] It is completely feasible for Congress to reverse or revise that choice, by withholding or conditioning appropriations, and by directly legislating. Therefore, in the circumstances, and without prejudice to further consideration as the impact of the regulations unfolds or as particular grants affect or threaten particular plaintiffs, the Court holds that the regulations do not exceed the Secretary's authority.

In reaching this conclusion, the Court has not overlooked the fact that both the statutory language and legislative history of section 16 suggest that even if Congress had contemplated a "mainstreaming" approach when it enacted section 16 it contemplated it only with respect to future vehicle acquisition and facility construction. The statute states that the "special efforts" shall be made "*in the planning and design*" of mass transportation facilities and services. The legislative history reveals that section 16's sponsor described the provision as one that would allow "barriers to travel [to] be removed *at [a] program's inception.*" 116 Cong.Rec. 34180–81 (September 29, 1979) (emphasis supplied). Neither has the Court overlooked the fact that Congress did not

specifically contemplate a regulatory program entailing high costs when it passed section 16. The sponsor of the provision noted that travel barriers could be removed "with very little if any additional costs," and emphasized to his colleagues that "we are not talking about appropriating additional funds here." *Id.* Moreover, section 16 received very scant attention in Congress, in contrast to the extensive debate and discussion that commonly attend legislation entailing large-scale expenditures on the federal or local level. In fact, the provision was explicitly characterized in the Senate record as being "relatively minor in nature and of little consequence." 116 Cong.Rec. 34952 (October 5, 1970) (statement of Sen. Proxmire). The Court has found nothing in the language or history of section 16, however, to persuade it that that section was intended affirmatively to curtail the Secretary's otherwise broad discretion under sections 3 and 5, and the Urban Mass Transportation Act as a whole, to guarantee "all citizens" mass transportation by imposing on federal grants "such terms and conditions as he may prescribe."[29]

In passing section 16, Congress made an initial but definite move in the direction of providing mass transit services for the elderly and handicapped; in so doing, it provided a guide for further action by the Secretary. Section 16, viewed in the context of the Secretary's broad authority to impose conditions on grants and loans, serves as an important supplement to that authority.

The fact that Congress may not have specifically contemplated the prospect of subway retrofitting,[30] for example, or the

---

**28.** For example, Section 321 of Public Law 95–599, requires a January 30, 1980 report from the Secretary of Transportation to Congress of an evaluation of the light-rail public mass transportation "made to determine ways to make, and the desirability of making, such modes accessible to and usable by handicapped persons."

**29.** DOT intended to invoke the Secretary's authority under the Urban Mass Transportation Act in promulgating the regulations; the fact that it recited only one provision of that Act

does not invalidate its entire effort. The citation to section 16(a) was sufficient to invoke the full statute, of which section 16 was an integral and inseparable part.

**30.** It is at least debatable whether Congress contemplated subway retrofit when passing section 16. The statutory language and legislative history, as noted, seem to indicate that Congress viewed section 16 as addressing only future vehicle acquisitions and facility construction; and, of course, there was no specific mention of subway retrofit in the statute, in the

full extent of the costs that would be entailed by such retrofitting and by other efforts to make mass transit facilities available to the handicapped cannot fairly be construed as a Congressional rejection of those alternatives. Furthermore, Congress will have a continuing opportunity to revisit that issue and limit the cost as it considers and acts on future DOT appropriation requests.

It may well be, as plaintiff contends, that these statutes do not, on their face, require that all mainstream transportation be made universally accessible to the handicapped. As an original question, a reasonable person might decide on the record, or as a matter of policy, that special services would adequately, or even better, carry out Congress' directive that federally-funded transportation services be furnished "all" citizens, including the handicapped. And, if the Secretary's authority were derived entirely from section 504, the regulations with respect, for example, to improvement of the five existing inaccessible subway systems might be in tension with the Supreme Court's prohibition against conditioning funds on affirmative action by recipients. But after extensive deliberation about a substantial record compiled over a long period of time, the Secretaries of HEW and Transportation have interpreted those statutes as authorizing, if not requiring, access on the "mainline." These authorizations and requirements are subject to limited extensions and exemptions to relieve undue hardship on states and localities and make provision for waivers and supplemental financial assistance where delay does not prevent serious dislocation. Interpretations of statutes by the cabinet officers responsible for executing them are entitled to considerable deference in a reviewing court. And the Court need not ignore the fact that the

Secretary of Transportation who issued these Regulations was a member of Congress and Chairman of the Budget Committee of the House of Representatives in 1973 and 1975, when those statutes were enacted. Moreover, Congress has the Secretaries' decisions before it and may decide they have wrongly decided, because they misjudged cost-benefit factors or because of fiscal, policy or even political considerations. If so, Congress can revoke or amend the regulations. In fact, in the most recent DOT appropriations, Congress has, in effect, tentatively ratified the regulations as they relate to buses, even while directing DOT to evaluate the costs and benefits of mainline accessibility and the "reliability, maintainability, and operability" of wheelchair lifts. See Pub.L. 96–131, H.R.Rep.No. 272, 96th Cong., 1st Sess. 48 (1979). In any event, the Court is persuaded that Congress empowered the Secretaries to make the choice they made, and that the DOT regulations cannot be struck down as not authorized by statute.

## B.

The conclusion that the regulations here at issue are authorized by the Urban Mass Transportation Act and the Federal Aid Highway Act is reinforced by the further Congressional directive contained in section 504 of the Rehabilitation Act of 1973.[31] The U.S. Supreme Court recently considered section 504 in a suit brought by a handicapped individual challenging the denial of her application for admission to a nursing program at a local college receiving federal financial assistance. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Court looked to the language, purpose and history of section 504 in concluding that the

committee reports, or on the floor. On the other hand, retrofit of existing facilities might seem to be the natural and intended corollary of a requirement that vehicles be accessible. In any event, the issue of subway retrofit concerns only five existing inaccessible subway systems. *See* Defendants' Exhibit 20, at 12, and Congress has already asserted its authority

over this issue by denying funding for subway retrofit in 1980. *See* Pub.L. 96–131.

31. Section 504 states that "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from participation in [or] denied the benefits of . . . any program or activity receiving federal financial assistance."

statute does not authorize the imposition of any "affirmative action" obligation on recipients of federal funds.[32] The Court noted that "the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons [will not always] be clear." It recognized, however, two critical factors identifying "affirmative action": whether "fundamental alterations" in the "nature" of a program were required, and whether "undue financial and administrative burdens" were imposed. Id. 99 S.Ct. at 2369–70.

If the Department of Transportation regulations here at issue had rested solely on Section 504, Davis might create serious doubts about their validity. The architectural barriers whose removal is mandated by the regulations may well be entirely collateral to the "nature" of the mass transit program itself, and the regulations fully consistent with, and in fact in furtherance of, the purposes and goals of that program. But even if the changes required by the regulations are not fundamental alterations in the "nature" of the program, it is apparent from undisputed facts on the record that grantees will probably need to make affirmative efforts of "substantial dimension" to accommodate their facilities to the handicapped.

Moreover, while the legislative history of section 504 does not indicate that Congress conceived itself as enacting or authorizing programs involving large expenditures,[33] this may be more the result of Congressional inattention to the costs of implementing the policy of nondiscrimination announced in section 504 than a Congressional determination that such expenditures would not be necessary to effectuate that policy. Furthermore, plaintiffs do not object to providing "special services" for the handicapped, which themselves involve considerable expense (even if perhaps less than the potential cost of the mainlining approach reflected in the DOT regulations).[34] Ultimately plaintiffs do not object so much to the affirmative effort itself; they object to the form of the effort. They simply prefer special service to mainline service; both entail substantial cost. The language and legislative history of section 504 and the other statutes as well as administrative law jurisprudence persuade the Court that this was just the kind of choice which Congress authorized DOT to make, at least in the first instance.

In any event, even if, as Davis seems to suggest, section 504 would not independently justify the DOT regulations, that section does further buttress the Secretary's exercise of his authority under the Urban Mass Transportation Act and the Federal Highway Act. It therefore reinforces the conclusion already reached that the DOT regulations do not exceed statutory authority.

## V

### A.

Plaintiffs have challenged as arbitrary and capricious the rulemaking pro-

---

**32.** In Davis, the Supreme Court held that Section 504 did not forbid professional schools from imposing physical qualifications for admission to their clinical training programs. The Court concluded that the language of Section 504 indicates "only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context," and stated that an "otherwise qualified" person is "one who is able to meet all of a program's requirements in spite of his handicap." 99 S.Ct. at 2366–67. The applicant in Davis suffered from a serious hearing disability and had to rely on lipreading to understand others; lipreading, however, was often impossible in the clinical phase of Southeastern's nursing program. The Davis Court observed that the applicant could not have completed the nursing program unless the college either provided her with "close, individual attention by a nursing instructor"—which the regulations made clear was not required—or instituted curricular changes amounting to "fundamental alterations in the nature of [the] program," which the Court held the regulations did not require and could not require under Section 504.

**33.** In fact, the budget analysis accompanying the bill on the floor reveals that Section 504 was projected as having no significant financial impact. See S.Rep.No.93–318, 93d Cong., 1st Sess. 51 (1973) U.S.Code Cong. & Admin.News 1973, p. 2076. (Committee on Labor and Public Welfare).

**34.** See, e. g., Plaintiffs' Exhibit W.

ceeding pursuant to which the Department of Transportation regulations were adopted. They claim that, even to the extent that the Urban Mass Transportation Act and the Federal Aid Highway Act might authorize the regulations in question, as the Court has now .ruled they do, those regulations are invalid because of a deficiency in the rulemaking process: *i. e.,* DOT allegedly failed to consider all alternatives under the two statutes because it ·erroneously assumed that section 504 and HEW guidelines required that facilities be accessible to the handicapped and that provision for special services was not a permissible alternative.[35] Plaintiffs are concerned particularly that DOT viewed itself as so constrained by section 504 and the HEW regulations that it failed seriously to consider a "local options" approach [36] that would have been one alternative under sections 16 and 165(b).

It may be that DOT interpreted the HEW guidelines as requiring more extensive accessibility than they actually did or actually could have under the authority granted by section 504. But, for the reasons set forth below, even if DOT did so interpret the HEW guidelines, the regulations are not invalid for that reason.

 · 1.

DOT's "section-by-section analysis" accompanying its final rules plainly reflect

DOT consideration of alternatives to full accessibility. There is extensive discussion of the costs and benefits associated with the accessibility policy adopted in the regulations and with prominent alternatives that had been advanced by commenters. *See* 44 Fed.Reg. 31455–60 (May 31, 1979). These discussions reflect both a careful consideration of the various alternatives and an adequate basis for the ultimate decision. The discussion with respect to bus systems does not even allude to the HEW guidelines. The discussion as to rapid and commuter rail systems states that "the concept of local option as expressed by many commenters is inconsistent with the . . . HEW guidelines," *id.* at 31459; but it discusses the costs and benefits of the key station policy at some length. Although it does not specifically discuss the costs and benefits associated with "special service" alternatives, the "special service" alternatives to accessible rapid and commuter rail systems are apparently the same as, or similar to, the special service systems that would be alternatives to accessible bus systems. *See* Defendants' Exhibit 20, at 19–23. The costs and benefits of these were fully considered. In any event,˙ the costs and benefits of rapid rail alternatives *were fully considered* in the record. *See id.* The DOT section analysis with respect to light rail systems expressly states that the local option alterna-

---

**35.** Defendants contend that the decision of our Court of Appeals in *National Wildlife Federation v. Snow,* 182 U.S.App.D.C. 229, 561 F.2d 227 (D.C.Cir. 1976), establishes that plaintiffs' "procedural" claims under the Administrative Procedure Act must fail because the DOT program is exempt from APA rulemaking requirements as "a matter relating to . . . public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2) (1976). *See* Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Preliminary Injunction, filed July 23, 1979, at 43 n.42. The *National Wildlife* decision and the 553(a)(2) exemption, however, do not dispose of plaintiffs' claims. *National Wildlife* concerned the question of whether an agency was required to follow notice and comment rulemaking procedures when adopting regulations governing the administration of the Federal Aid Highway grant program. The Court held that it was not. Here, however, the agency has already, quite commendably, proceeded by informal rulemak-

ing, notwithstanding the fact that such a course was not required under *National Wildlife.* Plaintiffs' claims in this case are that the agency's actions in adopting the regulations were arbitrary and capricious, and that the regulations themselves are arbitrary and capricious. Plaintiffs' cause of action as to these claims is based not on section 553, to which the grant exemption applies, but on sections 702 and 706, which apply to all agency action. *See* 5 U.S.C. §§ 551(11), (13) ("agency action" includes grants of money or assistance). Plaintiffs may perhaps have miscast their claims, but those claims are nevertheless entitled to full consideration.

**36.** A "local options" approach is one granting substantial discretion to local authorities to determine whether to meet the transit needs of the handicapped by making public systems accessible or providing "specialized services."

tive was not adopted "for the same reasons as discussed in connection with bus and rapid and commuter rail systems." *Id.* at 31460.

Furthermore, DOT independently concluded that the accessibility requirements which it adopted were appropriate and desirable as a matter of policy. For example, DOT commented with respect to its regulations governing "accessibility in general": "the HEW guidelines require, *and DOT's policy supports*, making all modes of transportation accessible for all persons, regardless of handicap. 44 Fed.Reg. 31448 (May 31, 1979) (emphasis supplied).[37] In fact, DOT not only considered alternatives to full accessibility, but incorporated some elements of those alternatives into its regulatory scheme. The "key station" policy, under which only the most important and frequently used stations need be made accessible (about 40% of all stations on average), is an example of just such a compromise. The Court is persuaded that DOT adequately addressed the range of alternatives available under sections 16 and 165(b) and that the regulations are not procedurally invalid.

### 2.

In reaching this conclusion, the Court has taken into account the fact that the HEW guidelines were developed by HEW in compliance with an express directive of the President. *See* p. 3, *supra.* HEW published a proposed rule which clearly framed the question of whether handicapped should be accommodated by access to all facilities or by special services. The issue was considered in terms of transportation along with all other federally-funded facilities and services. The resulting HEW guidelines made specific reference to transportation and announced the federal policy that generally the handicapped would be accommodated by access to all facilities, subject to extension, exemption and waiver. Plaintiffs are substantial public bodies which had

actual and constructive notice of HEW's deliberations and the end product establishing the mainlining principle. Plaintiffs did not appeal from the rulemaking which resulted in the HEW guidelines, but waited over two years, until the DOT rulemaking had completely run its course, before bringing this current challange. While the Court is persuaded that the Secretary of Transportation made an independent judgment in favor of mainlining as distinguished from special services, and that the choice he made was a reasoned one supported by sufficient evidence, it is not convinced that it would, under the particular circumstances here, have been inappropriate for him to accept, without independent consideration, the federal policy announced in the guidelines. The plaintiffs' objection to the Secretary's action as arbitrary and capricious is less appealing than it might otherwise be because of plaintiffs' apparent failure to test the seminal judgment of HEW. In any event, the Court concludes that the rulemaking here is not the result of an arbitrary and capricious process.

### 3.

■ In light of this conclusion, plaintiffs' challenge to the HEW guidelines themselves must fail. The DOT regulations stand independently of the HEW guidelines, and would remain in effect even if plaintiffs were granted the declaratory and injunctive relief they seek with respect to the guidelines. Because plaintiffs would not benefit from the relief they seek with respect to the guidelines, they present no concrete case or controversy as to that portion of their complaint. Consequently, plaintiffs' challenge to the HEW guidelines must be dismissed for failure to state a claim upon which relief may be granted.

### B.

■ Plaintiffs also assert that the regulations are arbitrary and capricious be-

---

37. The independent analyses of legal and policy considerations is also reflected in DOT's Regulatory Analysis for the "Section 504" regulations. *See* Defendants' Exhibit 13, at VI–3, VI–4.

cause, they allege, DOT failed in promulgating the regulations to recognize limitations on available technology. Plaintiffs focus on two main technological requirements: wheelchair lifts for buses and "gap-closing" devices for subway and commuter rail cars. There is an immediate requirement in the Regulations that wheelchair lifts accompany any new buses purchased; however, as DOT has noted, there is an 18 month lag between the ordering of a bus and its delivery, providing some additional time for technological development. *See* 44 Fed.Reg. 31457 (May 31, 1979). The regulations require gap-closing devices only if they are determined to be necessary for the accessible operation of the systems; in any event, the requirement is deferred, such devices being necessary only on new subway and commuter rail cars acquired after January 1, 1983. In addition, there is an approximate two-year period between order and delivery of subway and commuter rail cars. *See* 44 Fed.Reg. 31459 (May 31, 1979).

There is a wealth of information in the record concerning wheelchair lift technology. Plaintiffs complain in essence that all the "bugs" have not been worked out of the devices, that the incidence of lift malfunction is high enough to render the lifts, at the least, "commercially unfeasible." The record indicates, however, that DOT has a reasonable basis in the record for anticipating that feasible lifts are either currently available or would be available by the time any new buses were ready for delivery.

*See, e. g.,* Affidavit of George Pastor. DOT's conclusion that wheelchair lifts are feasible reflects an exercise of its special expertise and is entitled to great deference. While plaintiffs offer reasons which could persuade a decisionmaker to a contrary decision, this Court cannot say that DOT's conclusion is arbitrary and capricious.[38]

There is, similarly, substantial evidence in the record concerning the feasibility of accessible rail systems. *See e. g.,* Peat, Marwick, Mitchell & Co., The Cost of Making Urban Rail Transit Accessible to the Handicapped, Final Report, November 3, 1978; Louis T. Klander and Associates, A Study to Accommodate the Elderly and Handicapped on Existing Commuter Rail Coaches, December, 1977. DOT's section-by-section analysis reveals that transit operators have several options as to the means by which subway and commuter rail may be made accessible to the handicapped:

> If a system has mostly high platform stations flush with car entry level, it might modify its other stations along the same lines, thus obviating any need to equip its rolling stock or stations with lifts. On the other hand . . . a system may provide access to its vehicles with lifts and avoid modifying most platforms. Platform/train gaps could be closed by automatic equipment extending from cars or by "gangplank" devices either carried on the train or stored in the station . . .

---

38. In a related vein, plaintiffs point to recent developments concerning the "Transbus" in an attempt to argue that the Secretary should have delayed adoption of final regulations, or perhaps even instituted an entirely new rulemaking proceeding. DOT's Notice of Proposed Rulemaking indicated that the requirement that all buses acquired after the effective date of the regulation be accessible was contemplated as an interim measure that would be superceded by the requirements of the Transbus regulations. *See* 43 Fed.Reg. 25020 (June 8, 1978) (NPRM). In light of the experience with Transbus, however, the Secretary fashioned the final rule to stand independently of the timing of the Transbus program. *See* 44 Fed.Reg. 3147 (May 31, 1979). Such a modification does not make the NPRM defective: plaintiffs had adequate notice of the general subject of the rulemaking and ought to have anticipated that the proposed rule might be modified in light of developments during the rulemaking process. Moreover, as plaintiffs point out, the Secretary knew of the Transbus developments well before publication of the final rule, and could reanalyze the extensive administrative record in light of these developments. The Secretary's determination that adequate lift technology is or will be available is not arbitrary and capricious; whether standard lift-equipped buses are eventually replaced with Transbuses does not affect this conclusion. The Court is persuaded that the Secretary has adequately addressed the issues relating to bus accessibility, and that there is a sufficient basis for his final rule.

44 Fed.Reg. 31459 (May 31, 1979). DOT recognized that some of these options, particularly the installation of lifts to reduce vertical car/platform gaps, would require the development and deployment of new technology, and emphasized that the January 1, 1983, solicitation date, together with the approximately two-year period between orders and delivery permitted sufficient time for the development of this technology. *See id.* It is well settled that an agency may impose requirements entailing more advanced technology than exists at the time the requirement is adopted. *See, e. g., Chrysler Corp. v. DOT*, 472 F.2d 659, 671–74 (6th Cir. 1972). Moreover, if gap closing devices prove to be necessary, and if the development of technology for such devices proves to require more time than it would currently appear to, the regulations do not foreclose applications for extensions or waivers under section 27.99 or petitions for relief under 49 C.F.R. § 5.11. *See* pp. 817–818, *supra.*

### C.

■ Finally, plaintiffs allege that the regulations are arbitrary and capricious because they impose greater costs but will result in fewer benefits to the handicapped than alternate approaches. As a corollary claim, plaintiffs assert that the regulations fail adequately to consider diversity in local conditions, allegedly affecting both the feasibility and costs of compliance and the benefits potentially flowing therefrom.

Plaintiffs have a heavy burden to meet in attempting to establish these claims. As noted in section V.A. above, the record reflects that DOT extensively considered the costs and benefits associated with the requirements in the regulations and the various alternatives to them. Judicial review of DOT's final decision on this issue is an extremely limited one. DOT's ultimate cost-benefit determination, as reflected in the regulations, is an exercise of its special expertise and is entitled to great deference. The Court cannot say that the costs of the regulations so far outweigh the benefits as to make the regulations arbitrary and capricious; nor can the Court conclude that some

alternative approach would have had a lower cost-benefit ratio, or that even if it did, DOT's decision to reject that alternative was arbitrary and capricious. Moreover, as already indicated, Congress retains a powerful final word on this issue by its control of the appropriations process and its direct power to amend or revoke the regulations.

Plaintiffs attempt to support their contentions in part by pointing to current ridership data from accessible systems. DOT stated in its section-by-section analysis, however, that its "starting point for estimating the probable benefits to be gained from accessible mainline service is the potential market to be served." 44 Fed.Reg. 31456 (May 31, 1979). As DOT explained, "it is necessary to create accessible service and educate the public about it before the significant potential market of handicapped users is likely to ride the buses in large numbers." *Id.* at 31457. Statistics as to current ridership response to newly or partially accessible transit systems and attitude and opinion surveys were thus not fully reliable guides to the long-term benefits that would flow from the regulations. For example, as DOT noted with respect to rapid and commuter rail,

> Systems which are partly or wholly accessible . . . report relatively small but growing numbers of handicapped users of their station elevators. It is reasonable to believe that these numbers will increase as more accessible buses begin to feed into the rail systems and as other barriers to the movement of handicapped people are eliminated.

*Id.* at 31459. Furthermore, it is DOT's view that the potential market is significant: with respect to bus systems, for example, a DOT study found that there are "about 1.5 million people who live within a half-mile of a bus stop and for whom bus stops are a barrier which would prevent them from using buses." *Id.* at 31456. In addition, DOT took the view that "the Department's decisions . . . cannot be exclusively tied to cost-benefit analysis. The human value of providing accessible transit services to all persons must weigh heavily in the deci-

sions." [39] *Id.* at 31459. The Court cannot say that DOT's considered judgment that the potential service market was a more reliable guide to probable benefits than current ridership data or opinion surveys viewed in isolation or that humanitarian considerations should have great weight was arbitrary and capricious.

Plaintiffs also impliedly claim that even if the regulations are not arbitrary and capricious as a general matter, they may be arbitrary and capricious as to certain transit systems because DOT failed adequately to tailor the requirements of the regulations to the range of varying conditions in different localities across the country. Plaintiffs suggest, for example, that the benefits of accessible bus systems in rural areas may be considerably less than in urban areas, and may not justify the costs. This is, of course, the very type of claim which would likely best be considered in an individualized proceeding initiated pursuant to one of the waiver provisions. In any event, the claim cannot succeed here. Underlying plaintiffs' concerns is undoubtedly their longstanding preference for a "local options" approach. DOT does, of course, have responsibility to consider varying local conditions as they might affect the feasibility of compliance with or realization of benefits from a national regulatory program. But a "local options" approach was not mandated by the statutes, HEW guidelines, or by the rulemaking record here. DOT has, and needs, the authority to achieve some degree of uniformity in national regulatory programs. It has not exceeded that authority in this case. For example, with respect to bus systems in rural areas, DOT observed that although fewer handicapped persons may benefit from the accessibility requirement, public transportation is likely to be quite important for them, as alternative means of transportation may be less available. If individual transit authorities are confronted with particular circumstances that would make DOT's adherence to the regulatory requirements arbitrary and capricious as to them, they may petition the Secretary for relief under one of the applicable waiver provisions. And, again, Congress may well be heard from on this issue.

## VI

Plaintiffs have alleged that DOT violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 (1976), by failing adequately to consider the possible environmental consequences of the final regulations. NEPA states that

> The Congress authorizes and directs that, to the fullest extent possible . . . all agencies of the Federal Government shall—
>
> .    .    .    .    .
>
> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Plaintiffs have asserted that an environmental impact statement ("EIS") is necessary; alternatively, they have challenged the adequacy of the six-page "Final Negative Declaration" prepared by the Department to accompany the final rule. *See* Defendants' Exhibit 14. Defendants conceded at oral argument that compliance with the mass transit regulations will necessitate many activities by local authorities that will require site-specific environmental

---

**39.** *Cf. Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *overrul-* *ing Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

impact statements, but maintained that no "national" or "programmatic" EIS is required. Plaintiffs complain that there will be cumulative or synergistic effects from the many activities nationwide that will not adequately be accounted for in the individual EIS's, or at least will not be accounted for early enough to allow any meaningful modification of the regulatory scheme effected as conditions to grants.

■ Under NEPA, there are two major questions to be resolved in determining whether an EIS must be prepared in accordance with section 4332(C). The first is whether there is a "recommendation or report" on a "proposa[l] for legislation [or] other major Federal actio[n]." The key issue here is whether a given federal action is a "major Federal action" within the meaning of the statute. If there is no major Federal action, section 4332(C) does not apply and there need be no EIS. If there is a major Federal action, however, a second question must be resolved: whether the action is one "significantly affecting the quality of the human environment." If it does not "significantly affec[t]" the environment, an EIS is not required.

Defendants apparently contend both that adoption of the DOT regulations is not a "major Federal action" and that it is not an action "significantly affecting the quality of the human environment." Defendants cite the Supreme Court's decision in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), in support of their position and assert that it is "controlling" as to the environmental issues in this case.[40] *Kleppe* is an important guide, but it does not support the defendant. In fact, the decision in *Kleppe* and the undisputed acceptance there of a nationwide EIS is a firm precedent for a decision requiring a nationwide EIS here.

In *Kleppe*, the Department of Interior had prepared local environmental impact statements, and, of particular importance here, had also prepared an environmental impact statement about the effects of the questioned program *nationwide*. Several environmental groups nevertheless brought suit to prevent various federal agencies from allowing development of coal reserves on federal land in a region identified as the "Northern Great Plains region" without the preparation of a *regional* "comprehensive environmental impact statement." 427 U.S. at 395, 96 S.Ct. at 2723. The Supreme Court, while accepting as given the nationwide EIS, held that no *regional* EIS was required, because there was no regionwide "proposal . . . for major federal action" within the meaning of NEPA: there was no overall plan for regional development. Rather, the Court found, "all proposals are for actions either local or *national* in scope." *Id.* at 399, 96 S.Ct. at 2725 (emphasis supplied).

In light of *Kleppe*, there can be no dispute that the DOT regulations at issue here constitute a "proposal . . . for major federal action" of nationwide scope. *See also Defenders of Wildlife v. Andrus*, No. 79–1410, (D.C.Cir. February 5, 1980). In fact the Department's Final Negative Declaration implicitly recognizes that adoption of the regulations is "major federal action." Thus, NEPA requires the preparation of an environmental impact statement unless the regulations do not "significantly affec[t] the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1976).

Defendants concede that the regulations will require many actions by transit authorities all across the country which will, individually, significantly affect the environment and so require an EIS with respect to each project. The defendant maintains, however, that the national action—adoption of the regulations—will not significantly affect the environment nationwide. It argues that the individual, site-specific EIS's prepared by local authorities will adequately account for the environmental consequences of the activities affected by the regulations and need not be supplemented with a national EIS.

---

40. *See* Defendants' Response to Plaintiffs' Supplemental Filing, filed October 22, 1979.

█ The defendants' position is untenable. A regulatory program requiring hundreds or perhaps thousands of actions each "significantly affecting the . . . environment" must itself be regarded as "significantly affecting the . . . environment" within the meaning of the statute. The fact that numerous individual EIS's will be required for many particular projects initiated pursuant to this national program does not diminish its potential environmental effect nationwide; rather, it attests to it. Moreover, it seems obvious that in addition to what is conceded this program may have a cumulative effect which is greater than the sum of its individual effects. The program will involve expenditures in the billions and affect tens of thousands of vehicles and millions of passengers traveling more than 5.8 billion miles every year in hundreds of large and small communities nationwide. The environmental impact of the single decision to require lifts on urban buses will increase the dwell time of each in an as yet inadequately measured dimension and with as yet uncalculated effects on, for example, fuel requirements, vehicle emissions, and traffic congestion.

The conclusion that the DOT program will significantly affect the environment is consistent with and supported by the decision in *Kleppe*. As noted, the agency in *Kleppe* had in fact prepared a "Coal Programmatic EIS" to accompany the new national leasing program. *Id.* at 398, 96 S.Ct. at 2724. The Court noted that

> the federal petitioners agreed at oral argument that § 102(2)(C) required the Coal Programmatic EIS that was prepared in tandem with the new national coal-leasing program . . . . Their admission is well made, for the new leasing program is a coherent plan of national scope,

and its adoption surely has significant environmental consequences.

*Id.* at 400, 96 S.Ct. at 2725–26. Thus, the *Kleppe* Court made clear that the national EIS that had to be prepared was in addition to the impact statements that might be required for particular proposed actions at the local level. *Id.* at 399–400, 96 S.Ct. at 2725.[41]

The DOT regulatory scheme here at issue does not differ significantly from the national coal-leasing program involved in *Kleppe* with respect to whether a national EIS is required. These regulations, like those in *Kleppe*, represent "a coherent plan of national scope [whose] adoption surely [will] ha[ve] significant environmental consequences." 427 U.S. at 400, 96 S.Ct. at 2726.

█ At oral argument defendants suggested nonetheless that a national EIS was not required, at least at this time, because the environmental effects of the regulations are too difficult to predict and any attempt to predict them would be highly "speculative." Defendants maintained that quantification and assessment of environmental effects would have to await individual, site-specific EIS's; presumably they argue in the alternative that even if a national EIS is required, the time for it is not yet ripe. Defendants' arguments are, however, somewhat disingenuous. DOT gave no indication in its Final Negative Declaration that it viewed the environmental effects as speculative and too difficult to predict or that it felt the time for an EIS was not yet ripe. Indeed, the Final Negative Declaration is necessarily premised on a DOT determination that the environmental effects of the regulations are presently susceptible to assessment. In any event, the Supreme Court's opinion in *Kleppe* puts the matter to rest. The Court there stated that

41. The reason for this should be evident. As the Court of Appeals has stated:

> It would be a "mistake to attempt to freight . . . a single environmental report on a single facility" with the broader considerations necessarily involved in an impact statement on the overall program. The issues discussed in an analysis of the overall program would be quite different from those

discussed in an analysis of a particular facility, and the relevant audiences, both in government and outside, would vary for each analysis.

*Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 156 U.S.App. D.C. 395, 408–09, 481 F.2d 1079, 1092–93 (D.C. Cir. 1973).

under the first sentence of § 102(2)(C) [of the National Environmental Policy Act] the moment at which an agency must have a final statement ready "is the time at which it makes a recommendation or report on a *proposal* for federal action." *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 320 [, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191] . . . (1975) (emphasis in original).

427 U.S. at 405–06, 96 S.Ct. at 2728. As noted, there can be no dispute here that the DOT regulations represent a "recommendation or report on a *proposal* for federal action."

> As our Court of Appeals has observed, one of the functions of a NEPA statement is to indicate the extent to which the environmental effects are essentially unknown. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry."

*Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission*, 156 U.S. App.D.C. 395, 408, 481 F.2d 1079, 1092 (D.C. Cir. 1973). Moreover,

> That the effects [of a program] will not begin to be felt for several years, perhaps over a decade, is not controlling, for the Act plainly contemplates consideration of "both the long- and short-range implications to man, his physical and social surroundings, and to nature, * * * in order to avoid to the fullest extent practicable undesirable consequences for the environment.

*Id.* 156 U.S.App.D.C. at 406, 481 F.2d at 1090 (quoting NEPA Guidelines of the Council on Environmental Quality).

Drafting a national EIS at this time would not impose an unbearable burden on the agency. Although "an agency's duties to issue a statement . . . are not inherently flexible or discretionary . . . the statute admits of some degree of flexibility and agency discretion in determining the contents of impact statements." *Id.* 156 U.S.App.D.C. at 407, 481 F.2d at 1091. "The agency need not foresee the unforeseeable." *Id.* 156 U.S.App.D.C. at 408, 481 F.2d at 1092. To paraphrase the Court of Appeals, "Certainly NEPA does not require the [Department] to forecast [the long-range effects of the DOT regulations] in the same detail or with the same degree of accuracy as would be required in a later site-specific EIS." *Id.* Rather,

> if the [agency's] environmental survey is prepared and issued in accordance with NEPA procedures, and if the [agency] makes a good faith effort in the survey to describe the reasonably foreseeable environmental impact of the program, alternatives to the program and their reasonably foreseeable environmental impact, and the irreversible and irretrievable commitment of resources the program involves . . . the survey [would] fully satisfy the requirements of section 102(2)(C). The resulting document may look very different from the impact statement the [agency] is used to issuing for particular [projects], but this . . . should not be . . . an excuse for not complying with NEPA at all.

156 U.S.App.D.C. at 408, 481 F.2d at 1092.

## B.

Even if there were uncertainty as to the need for an environmental impact statement in this case, DOT's Final Negative Declaration is an inadequate basis for a conclusion that none is required. The six-page Final Negative Declaration reveals that DOT did not take a sufficiently "hard look" at the environmental issues to satisfy the requirements of NEPA. *See Maryland-Nat'l Capital Park & Planning Comm'n. v. U. S. Postal Serv.*, 159 U.S.App.D.C. 158, 169, 487 F.2d 1029, 1040 (D.C.Cir. 1973). Most of the Declaration is simply a summary of the provisions of the regulations; only one and a half pages are devoted to poten-

tial environmental impacts. The declaration contains only two sentences addressing "noise," one sentence dealing with "air quality," two sentences addressing "land use and urban growth," and one sentence considering "other" effects. The statements are all conclusory and virtually devoid of supporting findings or data. The concluding sentence in. the Declaration's section on potential environmental effects, for example, states that "the regulation is expected to have no significant environmental impact with respect to water quality, community disruption and relocation, wetlands and floodplains, or other environmental variables." The Declaration does not meaningfully discuss the issue of traffic congestion or "dwell time." [42] This issue is only mentioned in the preamble to the regulations:

> With respect to the argument that the use of lifts would greatly slow bus service, the Department is *somewhat skeptical*. While there may be some slowing of service in some circumstances, this problem is *not likely* to be of the scope or magnitude suggested  . . . .. Any regular delays of this kind can and should be worked into schedules in such a way that service disruptions or undue slowdowns of service will be *minimal*.

44 Fed.Reg. 31457 (May 31, 1979) (emphasis supplied). This kind of unquantified speculation is not an adequate basis on which to dismiss these potential environmental effects, especially in light of DOT's earlier though similarly conclusory and unsupported assertion that the regulations would actually reduce dwell time. See Defendants' Exhibit 11 (Final Negative Declaration accompanying Notice of Proposed Rulemaking) at 3.

Nor is there any other evidence in the record in this Court reflecting enough consideration of potential environmental effects in forming the regulations to justify defendants' decision to finesse NEPA's requirements for Environmental Impact Statements about large-scale federal programs. Defendants' affidavit of George Pastor, offered to support the Negative Declaration, reveals that there was no systematic factual investigation of "dwell time," no quantification of estimated impacts, and no substantial and sufficiently extensive evidence underlying any conclusion that dwell time was of "insignificant" environmental impact. See also Affidavit of Martin Convisser.

Even if DOT had taken the requisite "hard look" at the potential environmental impacts of the regulations, however, its Final Negative Declaration would be an inadequate statement of reasons, under both NEPA and the DOT regulations implementing NEPA, supporting its conclusion that no environmental impact statement was necessary. DOT's regulations provide that

> a negative declaration must include documentation sufficient to support the determination that the proposed action does not have a significant impact on the environment.

39 Fed.Reg. 35238 (September 30, 1974) (DOT Order 5610.1B). It is clear that such documentation is lacking in the Final Negative Declaration and is not provided de facto either in the administrative record or in the proceedings here.

## VII

The Court has concluded that defendants are entitled to summary judgment with respect to plaintiffs' challenge to the validity of the regulations but that plaintiffs are entitled to summary judgment with respect to their claim that an environmental impact statement should have accompanied DOT's Final Regulations. The question remains as to what relief is appropriate.

In *Kleppe v. Sierra Club, supra,* the Supreme Court made clear that a determination that an EIS must accompany certain agency action does not automatically require an injunction against the agency action pending completion of the EIS. [43] The issue of the propriety of an injunction is

---

**42.** *See* p. 821, *supra.*

**43.** 427 U.S. at 405, 96 S.Ct. at 2728.

rather a separate and further question; a balancing of equities must guide the decision as to whether to issue an injunction. See 427 U.S. at 407–08, 96 S.Ct. at 2729. The balance of equities in this case militates against a grant of injunctive relief. As defendants correctly point out, plaintiffs largely ignored their NEPA claims at the preliminary injunction stage of this litigation; in any event, this Court found that plaintiffs were neither suffering from nor threatened with any irreparable injury. See Memorandum and Order of September 17, 1979. Plaintiffs still suffer no such threat. No particular project requiring a local EIS can go forward until that site-specific EIS has been completed. Under the regulations, the only major actions that transit authorities must take immediately are to acquire accessible buses and subway cars, if they decide to acquire any new vehicles at all, and to initiate compliance planning.

With respect to other provisions of the regulations, "recipients are not required to begin alterations to existing transit facilities until any waiver requests are considered and key stations have been identified in transition plans, which are not due until up to 18 months from the effective date of the regulations. 49 C.F.R. § 27.103. This delay provides ample time for the defendants to rectify any violation of NEPA." Defendants' Reply Memorandum, filed September, 1979, at 28 n.19.

Although it is possible that DOT might as a result of its environmental assessment abandon its decisions to require accessible buses and subway cars, or that Congress would set aside the regulations or limit funding for the grants governed by them, the injury that would result to plaintiffs from such a reversal would not be irreparable: many unfilled orders could be modified,[44] and to the extent that this proved infeasible, plaintiffs' damages would, for aught that appears on this record, be quantifiable and compensable. In any event,

plaintiffs potential injuries and the related threat to the public interest resulting from defendants' failure to consider the long range environmental consequences of the regulations are not imminent. Most important, perhaps, an administrative remedy and appropriate judicial review will remain available for any plaintiff threatened with irreparable injury. See pp. 817–818, supra.

In deciding whether to enjoin the DOT regulations pending completion of the EIS, the Court has, consistent with Kleppe, attempted carefully to consider the public interest at stake. If the Court proved mistaken in its conclusion that an environmental impact statement is necessary, a program with possibly millions of beneficiaries would have been seriously delayed, to their discomfort and irreparable detriment. Moreover, the DOT program is one of unusual magnitude, and is the focus of active consideration in Congress. If Congress determines that the implementation of the DOT regulations should be delayed or aborted because of a lack of sufficient information concerning their probable effects, (or for any other reason) it can easily do so. In fact, Congress has already prohibited the use of federal funds in fiscal 1980 to retrofit any existing rail systems, pending completion of the cost-benefit studies it has ordered. See Pub.L.96–131, 93 Stat. 1027, 1032 (1979); H.Rep. 96–272 (Committee on Appropriations), at 48. In view of this Congressional action, any injunction against such retrofitting would be redundant.

For these reasons, the Court has concluded that under the standards enunciated in Kleppe, the regulations should not be enjoined pending completion of the EIS. The Court will, however, retain jurisdiction, on an inactive basis, to entertain applications for relief by those plaintiffs justifiably dissatisfied with the administrative action (or inaction) on any petitions for waivers, exemptions, or extensions they have filed, and to reconsider the decision on the merits

44. See Memorandum and Order of September 17, 1979, Conclusions of Law ¶ 9.

should any facts disclosed in the EIS so require.[45]

## ORDER AND JUDGMENT

Upon consideration of the cross-motions for summary judgment, the affidavits and exhibits in support thereof, the oral arguments thereon, and the entire record herein, including the record in respect to plaintiffs' motion for preliminary injunction, and for reasons set forth in the accompanying Memorandum, it is this 7th day of February, 1980, hereby

ORDERED: That plaintiffs' complaint against the defendant Secretary of Health, Education, and Welfare (now Health and Human Services) is DISMISSED for failure to state a claim upon which relief may be granted; and it is

FURTHER ORDERED, ADJUDGED AND DECLARED: That plaintiffs' motion for summary judgment as to the claim that the National Environmental Policy Act requires the remaining defendants to prepare an environmental impact statement to accompany Subpart E of the Department of Transportation regulations of May 31, 1979, 44 Fed.Reg. 31477–31481, is GRANTED; and it is

FURTHER ORDERED: That in all other respects defendants' motion for summary judgment is GRANTED and plaintiffs' motion is DENIED; and it is

FURTHER ORDERED: That defendant prepare and file an environmental impact statement on or before September 1, 1980, unless otherwise ordered by the Court; and it is

FURTHER ORDERED: That this Court will retain jurisdiction of this action, on an inactive status, to entertain applications for relief by those plaintiffs justifiably dissatisfied with the administrative action (or inaction) on any petitions for waivers, exemptions, or extensions they have filed with defendants, and to reconsider the decision

on the merits should any facts disclosed in the prospective environmental impact statements so require.

---

**45.** *Cf. Brown v. Califano*, No. 78 1864 (D.C.Cir. Jan. 31, 1980) (Court affirms lower court rejection of facial challenge to anti-busing amend- ments and approves its retention of jurisdiction to allow challenges to amendments as applied).